THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL D. SAVICKAS, Defendant-Appellant.

First District (2nd Division)   No. 1—90—1484

Opinion filed May 19, 1992.

Edward R. Vrdolyak, Ltd., of Chicago (William E. Reynolds and Phillip J. Bartolementi, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Defendant Michael D. Savickas was convicted by a jury of first degree murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)) and was sentenced to 28 years' imprisonment.

On appeal, he contends that (1) he was not proved guilty of murder beyond a reasonable doubt; (2) the jury was improperly instructed as to the State's burden of proof; (3) comments made by the prosecutor denied him a fair trial; and (4) his right to confrontation was violated by the nonproduction of a subpoenaed defense witness.

On March 31, 1988, Robert Walensky owned and operated the New Gold Coast Inn, a tavern located at 71st and Maplewood in Chicago. At approximately 4 p.m. that day, Daniel Chaplics and James Pecelli, both employees of the City of Chicago Department of Streets and Sanitation, arrived at the tavern. They sat at the bar and had several screwdrivers. At around 4:45 p.m., Kevin Murray and David Stack, employees of the City of Chicago Water Department, arrived at the tavern and also sat at the bar, drinking beer.

At approximately 6 p.m., defendant and Casey Janus, both foremen with the Water Department, entered the tavern and sat at the bar. Murray and Stack each had known defendant for about 12 years; neither Chaplics nor Pecelli knew defendant, but Pecelli was introduced to him later that evening.

After sitting at the bar for a short time, Stack and Janus, who was Stack's immediate supervisor, began a loud, profane argument that Walensky tried to stop. Janus, who appeared to be drunk, refused to settle down, so Walensky grabbed him by the arm, attempting to escort him out of the tavern. Janus then turned to defendant and said, "Give me the gun. I'm going to shoot this motherfucker." Shortly thereafter, Walensky was able to push Janus out the front door and return to tending bar.

After a few minutes, defendant began arguing with Stack, asking him why he did not like his boss, Janus. Stack responded that what happened between Janus and him was not defendant's concern. Defendant then threatened that he could have Stack's job. Although Murray, Chaplics, Pecelli, and Walensky heard defendant arguing with Stack, they did not hear the entire substance of the argument; Chaplics, however, did hear defendant tell Stack that he could have Stack's job. Defendant then pulled out his gun and, pointing it at Stack's stomach, said, "I could blow you away right now." Stack pushed the gun away and asked defendant what he was doing. Chaplics, who saw defendant pointing the gun at Stack, told Walensky, who then came out from behind the bar and asked defendant to leave.

Defendant responded, "Okay. Fine. No problem." However, defendant turned to the bar and began arguing again. After Walensky told him to leave again, defendant began verbally abusing Walensky, telling him that he could close down the tavern and that he could "kick the shit" out of him. Walensky told defendant to get out yet another time; several of the other city workers, though, said that they could take care of defendant and asked that Walensky give him a beer. Walensky put a beer bottle down in front of defendant, but pulled it away again when defendant called him a "dirty motherfucker

and a jag-off" and threatened, again, to shut down the tavern. Defendant also said that he was a member of the Chicago Outlaws, a motorcycle gang, and told Walensky, "I don't give a fuck about nothing." Although defendant wanted his beer back, Walensky refused to serve him and came around the bar and jerked defendant off his bar stool. At that time, defendant's gun fell to the floor. After defendant picked the gun up, Walensky walked him to the front door and pushed him out of the tavern.

After Walensky walked behind the bar, defendant began banging with the butt of his gun on the front window of the tavern. After banging several times, defendant walked away, but returned seconds later and resumed banging on the window with his gun. Walensky then grabbed a baseball bat which he kept behind the bar and ran out the front door, watching defendant walk south on Maplewood. Stack, Murray, Pecelli, and Chaplics stayed at the bar and did not go outside.

Thomas Vinicky, who occasionally cleaned and stocked the tavern for Walensky, however, got up from his bar stool where he was drinking a beer, telling Pecelli that, "I'm getting the hell out of here." Prior to leaving the bar through a side door, Vinicky, whom Walensky described as the "most passivistic" person, was not involved in any of the arguments at the bar, nor did he attempt to assist Walensky in expelling Janus or defendant from the bar.

As Walensky stood by the front door of the tavern, he could see defendant just beyond the side door, facing both him and Vinicky, who had exited the tavern through the side door. Vinicky, whose back was turned to Walensky, asked defendant, "What's the matter? Why are you doing all this?" Defendant, who was a few feet from Vinicky, then pulled out his gun and, as Vinicky was stepping backward, shot him in the chest. Walensky ran back into the bar, yelling that defendant had shot Vinicky and to call an ambulance. No one inside the tavern saw the shooting.

From behind the bar, Walensky grabbed a .32 revolver, and, accompanied by Chaplics, went out the side door to where Vinicky was lying. Walensky, Chaplics, and several other patrons of the tavern went over to Vinicky, who had no weapon in his hands or near him. Defendant then appeared from between two houses in the distance and began to walk towards the people gathered around Vinicky. Defendant still had his gun in his hand and was twirling it on his finger. Pecelli, who was also outside, yelled to Walensky to shoot defendant, but defendant continued to walk towards the tavern. When sirens could be heard, defendant abruptly turned and walked behind the alley of a funeral home.

After defendant went behind the funeral home, Edwin Gonzales, a 16-year-old from the neighborhood who had heard the gunshot and had seen defendant twirling his gun, saw defendant throw something on top of a roof. He also saw defendant try to stick something into the glass doors of the funeral home. As several police officers approached on foot, Gonzales saw defendant walk towards a truck, where he was apprehended by the police. Gonzales then told the police about the object on the roof.

Chicago police officer Harold Gordon was the first officer to arrive at the scene and, after calling an ambulance, took Pecelli with him in his squad car to look for defendant. Not finding him, Gordon let Pecelli out of the car; shortly thereafter, an older woman, who acted as the caretaker of the funeral home, shouted to Gordon that someone was hiding in the home's parking lot. Gordon conveyed this information by radio, entered the parking lot on foot, and, seeing defendant, ordered him to halt and then placed him under arrest.

Chicago police officer Robert Navigato, upon receiving Gordon's radio dispatch, entered the parking lot and saw defendant in the custody of Gordon. Navigato was told by Gonzales of the object on the roof and, after climbing to the roof, he recovered a snub-nosed .38 caliber revolver from the gutter. A search of the area also disclosed a spent cartridge and a live round near the passenger side of defendant's truck and another live round near the funeral home.

Chicago police detective Thomas Ptak, assigned to protect the scene of the crime, spoke with the officers present and examined the bullets found. The bullet found near the truck was a "hollow point," which would "mushroom" on impact, thereby creating extensive damage. The other bullet, found near the funeral home, was a ".38 Plus P." That bullet was also capable of inflicting extensive damage because it contained more powder and it had been manually serrated at its top, which would make it open up faster upon impact. According to Ptak, Chicago police officers were prohibited from carrying the Plus P bullets because those high-power bullets cause too much damage. Ptak also examined the gun; he found it to be a "pocket gun": the gun's cocking mechanism was shrouded, which made it very concealable and prevented it from getting caught on clothing when pulled out of a pocket.

After Ptak secured the scene, he went to the hospital where Vinicky was taken and learned that Vinicky had died. In the pocket of Vinicky's pants, Ptak found Vinicky's keys and a small, closed pocket knife with a 2½-inch blade. An autopsy disclosed that Vinicky had died from an extra-large bullet wound to the chest, inflicted by a high-

power bullet. The autopsy also revealed that Vinicky was two times over the presumptive limit for intoxication.

When Ptak arrived at the police station, two evidence technicians were preparing to perform a gunshot residue test on defendant. In response to defendant's inquiry about what they were doing, Ptak explained that the evidence technicians were going to perform a test on his hands in order to determine whether he had earlier fired a gun. Defendant then began wiping his hands across his sweaty face and beard. When told that that would interfere with the test, defendant continued to rub his hands across his shirt and pants. Ptak and the two evidence technicians then grabbed defendant's arms and physically restrained him for the test, the results of which were inconclusive.

While in the interview room of the police station, Ptak advised defendant of his rights. After telling defendant that if he had no money for an attorney, one would be provided free of charge, defendant began laughing. Defendant then said, "Do you know who I am? You guys are lucky my father is in Florida. You all would be in trouble." According to Ptak, the only time defendant appeared concerned was when the evidence technicians began putting things on the desk.

Several days after the shooting, Walensky met with Robert Cooley, an attorney he had seen at the police station after defendant's arrest. They met at a restaurant where Walensky offered to change his story if defendant's father paid him $200,000. Cooley said he would "get back" to him, but never did. A few days later, Walensky testified before the grand jury.

At trial, Walensky admitted that the liquor license for the New Gold Coast Inn was held in someone else's name because he was not allowed to operate a tavern due to two prior felony convictions; in 1969, he had been convicted of interstate transportation of stolen merchandise and in January 1988, he had been convicted of issuing a bad check.

After stipulations that the gun was found in a damaged condition and that it could not be determined whether the bullet recovered from Vinicky's body was fired from it, defendant testified in his own behalf.

Defendant had been employed as a foreman for the Water Department for approximately eight years. On March 31, 1988, Holy Thursday, he finished his shift at 4 p.m. and went to his bank to cash a check. Afterwards, he stopped by a friend's business to wish him a "Happy Easter" and then drove to a restaurant called Mia Pueblo to

meet Janus. The two had a few drinks and appetizers before leaving about 45 minutes later.

At approximately 6 p.m., defendant and Janus arrived at the New Gold Coast Inn, where defendant recognized several other city workers. At the time defendant entered the tavern he was carrying an unregistered gun; he explained that he carried the weapon during working hours for protection because of the rough neighborhoods that he had to enter. The bullets for the weapon were given to him by a Chicago police officer friend.

After arrival at the tavern, Janus got into a "heavy" argument with Stack about the last job performance rating that Janus had given Stack. During the argument, Janus turned to defendant and said, "Give me the gun, I'm going to shoot him now"; defendant, however, did not give his gun to Janus, who was drunk. Shortly thereafter, Janus was escorted out of the bar by Walensky.

Defendant then turned to Stack and told him that Janus loved him, that he treated him like family, and stated, "if he didn't, he could have suspended you three times a week, with the long lunches you take." Defendant then showed Stack his gun, stating, "Dave, if we all had it in for you, I would have given [the gun] to Casey, when he asked for it. He would have shot you. Nobody shot you, nobody beat you up, nobody harassed you. You're just being paranoid. Why don't you sit down, finish your beer. It's Easter weekend, relax, forget about it." After that exchange, in which no threats were issued by him, defendant put the gun away.

Thereafter, Walensky began to swear at defendant and told him to leave the bar. Defendant told him that he wanted to finish his beer, but Walensky came around the bar and jerked him off his bar stool. Defendant's gun fell out of his pocket, but he picked it up and put it back in his pocket. Walensky then told defendant that he had to leave the bar and began swearing at him; defendant swore back at Walensky and "might" have told him that he "wanted to kick his ass." Walensky then pushed defendant out of the tavern.

Defendant, who wanted to return to finish his beer, tried to reenter the tavern, but the door was locked. He then banged on the window with his hand; he had a large silver ring on his finger which may have made the banging loud. Defendant then walked away, but returned a few seconds later. After banging on the window a second time, defendant walked south on Maplewood, when he heard a voice say, "You're a jagoff." Defendant turned around to face Vinicky standing by the tavern's side door. Defendant could also see Walensky standing by the front door holding a baseball bat. Vinicky, who then

said to defendant, "You're a jagoff and I'm going to waste you," reached into his jacket, and started to pull out a gun. Defendant panicked, grabbed his gun, and shot Vinicky. Defendant then ran, but returned to the tavern when he realized what he had done. As he neared the tavern, he heard someone yell to shoot him so he ran into the alley. He then emptied his gun and threw it on the roof, thinking that nobody could then shoot him with his own gun. After throwing the gun away, defendant banged on the doors of the funeral home, yelling for someone to call the police.

After defendant was arrested and taken to the police station, he became afraid; he began wiping his hands on his face and clothing because he did not know what the evidence technicians were going to do to him. Defendant did not tell the police that they would be in trouble because of his father, who was a State senator; nor did he ever tell anyone in the bar that evening that he could have their jobs or could close down the tavern.

After defendant's testimony, several witnesses testified that defendant was a peaceful, nonviolent person.

At the close of the evidence, the jury found defendant guilty of first degree murder; he was subsequently sentenced to 28 years' imprisonment.

## I

Defendant initially contends that he was not proved guilty of first degree murder beyond a reasonable doubt. Specifically, he maintains that he was justified in the use of deadly force in self-defense. In response, the State asserts that defendant was properly found guilty of first degree murder beyond a reasonable doubt.

The Illinois statute on self-defense states:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself *** against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself ***." (Ill. Rev. Stat. 1987, ch. 38, par. 7–1.)

Killing in self-defense is justified where (1) force has been threatened against a person; (2) the threatened person is not an aggressor; (3) the danger of harm is imminent; (4) the force threatened is unlawful; and (5) the threatened person must reasonably believe that danger exists, countering it requires force, and the force used was required.

*People v. Parker* (1990), 194 Ill. App. 3d 1048, 1055, 551 N.E.2d 1012.

■ Here, the only witness, other than defendant, to the shooting was Walensky. Defendant contends that the testimony of Walensky, a convicted felon and an admitted extortionist, is not credible and must be scrutinized with caution. Nonetheless, issues concerning the credibility of witnesses are for the trier of fact to decide. (*People v. Mosley* (1979), 68 Ill. App. 3d 721, 725, 386 N.E.2d 545.) Here, the jury was presented with all the evidence concerning Walensky's convictions and his attempt to extort money from defendant's father; moreover, the jury was instructed that evidence of a prior conviction may be used to judge the believability of a witness.

Defendant further contends that his testimony established that he did nothing to provoke Vinicky, but that Vinicky threatened to "waste" him and pulled a gun on him, and that he reasonably believed that he had to shoot Vinicky, a "huge," drunk man. He maintains that Vinicky "was armed and drunk, shouted obsenities [*sic*] at [him], and was himself reaching for his weapon when the defendant was forced to used [*sic*] deadly force to repel the attacks upon him by two huge individuals."

Defendant, however, ignores the testimony from Walensky, who stated that Vinicky was the "most passivistic" person he knew; that Vinicky never got into or interfered in any fights; and that Vinicky merely asked defendant "Why are you doing this?" Similarly, Chaplics described Vinicky as someone who was very quiet and "never said anything to anybody." Pecelli likewise never saw Vinicky get into a fight or have any trouble with anyone. Furthermore, no gun was found on or near Vinicky and testimony from Vinicky's daughter established that she had never known her father to own or ever carry a gun.

As a reviewing court, this court is not at will to overturn the judgment of the trier of fact unless the evidence fails to prove each element of the crime beyond a reasonable doubt. (*People v. Almo* (1985), 108 Ill. 2d 54, 67, 483 N.E.2d 203.) The issue of self-defense is one of fact (*People v. Williams* (1980), 85 Ill. App. 3d 850, 858, 407 N.E.2d 608), and where, as here, defendant's testimony is contradicted, the trier of fact need not believe defendant. Defendant's testimony concerning what occurred inside the tavern is contradicted by numerous witnesses; defendant testified that he never threatened anyone with the loss of his job or the closing of the tavern, yet Stack, Walensky, and Chaplics all testified that they heard defendant's threats and saw defendant threaten Stack with his gun.

The jury, which listened to the testimony of defendant and the succession of witnesses presented by the State, and which observed the demeanor and sincerity of the witnesses, was better able than this court to judge witness credibility. Defendant's testimony was uncorroborated. The State's version was corroborated in many respects, and specifically by the absence of a gun on or near Vinicky's body. We note that any inconsistencies in the testimony of the State's witnesses were emphasized by defense counsel during cross-examination. The jury was free to believe the State's witnesses and to disbelieve defendant, obviously an interested witness in his own behalf. See *People v. Almo*, 108 Ill. 2d at 67.

All the evidence, viewed in a light most favorable to the prosecution (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453), compels the conclusion that a rational trier of fact could have reasonably found the elements necessary to convict defendant of first degree murder beyond a reasonable doubt.

## II

Defendant next contends that the jury was improperly instructed as to the burdens of proof for both first and second degree murder. Specifically, he asserts that the court failed to instruct the jury that the State had the burden to disprove his mitigating factors beyond a reasonable doubt. He argues that the jury should have been apprised that the State was required to disprove the elements of self-defense beyond a reasonable doubt.

In response, the State maintains that defendant has waived his right to raise this issue because of his failure to object both at trial and in a post-trial motion. (See *People v. Wade* (1989), 131 Ill. 2d 370, 375, 546 N.E.2d 553.) The State further argues that, assuming *arguendo* that the issue is not waived, the court's instructions properly stated the applicable law.

Defendant asserts that section 3—2 of the Criminal Code of 1961, which provides that, if an affirmative defense is raised, the State has the burden of proving a defendant guilty beyond a reasonable doubt as to that issue together with the elements of the offense, applies in the instant case where defendant raised the issue of self-defense. (Ill. Rev. Stat. 1985, ch. 38, par. 3—2.) He relies upon *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, and *People v. Shields* (1991), 143 Ill. 2d 435, 575 N.E.2d 538, for support. Neither case, however, supports reversal of defendant's conviction based upon the instructions given in the instant case. In *Reddick*, the Illinois Supreme Court held that the then-existing pattern jury instructions for murder and

voluntary manslaughter, when given together, suffered from two related defects; the instructions incorrectly informed the jury that the State was required to prove the mental conditions that reduce murder to manslaughter when properly the State should have been required to disprove those circumstances. (*People v. Reddick*, 123 Ill. 2d at 193-97.) In *Shields*, the Illinois Supreme Court held that *Reddick* applied retroactively to those cases that had been pending on direct review when the court decided *Reddick*.

The *Reddick* court noted, however, that its holding would have only limited application due to the legislature's abolition of voluntary manslaughter and its enactment of the offense of second degree murder. (*People v. Reddick*, 123 Ill. 2d at 197.) Under former law, the State had the burden to prove the elements of murder beyond a reasonable doubt; the defendant then had the opportunity to present evidence of a factor in mitigation, serious provocation or unreasonable belief, either of which must have been present to reduce an offense of murder to voluntary manslaughter. (*People v. Reddick*, 123 Ill. 2d at 197.) The State then had the burden to prove the absence of the factor in mitigation beyond a reasonable doubt. (*People v. Reddick*, 123 Ill. 2d at 198.) Under the present statute, which became effective July 1, 1987, the State still bears the burden to prove the elements of first degree murder; however, the defendant now bears the burden to prove, by a preponderance of the evidence, one of the factors in mitigation which must be present to reduce an offense of first degree murder to second degree murder. *People v. Shumpert* (1989), 126 Ill. 2d 344, 351-52, 533 N.E.2d 1106; Ill. Rev. Stat. 1987, ch. 38, par. 9—2.

■ In the instant case, the instructions given properly advised the jury of the burdens of proof for both first degree murder and second degree murder. The instructions provided that the State had the burden to prove defendant guilty of first degree murder beyond a reasonable doubt, but that it was defendant's burden to prove by a preponderance of the evidence that a mitigating factor was present for a guilty verdict for second degree murder.

Defendant contends that, because he raised the affirmative defense of self-defense (Ill. Rev. Stat. 1987, ch. 38, par. 7—14), the court should have instructed the jury that the State had the burden of proving him guilty beyond a reasonable doubt as to that issue. (Ill. Rev. Stat. 1987, ch. 38, par. 3—2(b).) Although it is true that where there is evidence of self-defense, the State must negate self-defense beyond a reasonable doubt (*People v. Buckner* (1991), 220 Ill. App. 3d 468, 581 N.E.2d 102; *People v. Brown* (1991), 218 Ill. App. 3d 890, 895,

578 N.E.2d 1168), a review of the record demonstrates that any failure to supplement the instructions was harmless beyond a reasonable doubt and any additional instructions could not have affected the jury's verdict. See *People v. Buckner*, 220 Ill. App. 3d at 473; *People v. Fierer* (1988), 124 Ill. 2d 176, 186, 529 N.E.2d 972.

Nowhere does the record reflect that the jury was erroneously advised that it was defendant's burden to prove self-defense; rather, even the State in closing argument acknowledged to the jury that the State's burden was to disprove self-defense. Furthermore, we find a dearth of evidence of self-defense in the record. Because the evidence supporting defendant's first degree murder conviction was so clear and convincing that the jury's verdict could not have been different had additional instructions been given, defendant's argument must fail. *People v. Shields*, 143 Ill. 2d at 454.

## III

Defendant next contends that he was denied his right to a fair trial by prejudicial remarks made by the prosecutor during opening statements and closing arguments, and statements made by the prosecutor allegedly in violation of a motion *in limine*.

The State responds that defendant has waived his arguments concerning statements made in closing argument and in violation of the motion *in limine* because he failed to raise those issues in his post-trial motion. In the alternative, the State asserts that all comments were proper.

The complained-of comments involved the State's remarks during its opening statement and its closing argument that defendant's father was a State senator. During opening statement, the prosecutor informed the jury that it was important for them to know that defendant's father was a senator because the evidence would show that defendant thought that this fact

> "gave him the power to threaten people with handguns, to threaten people with the loss of their jobs, to threaten Chicago Police Officers, to do whatever he wanted to do—because his father is State Senator Savickas.
>
> It also enabled one of our witnesses to think that he would make a buck, *** attempt to get some money from this guy, because there was something at stake for this State Senator."

In closing, the prosecutor argued that the witnesses who testified against defendant did so because they did not "care who his dad is." The prosecutor further argued that "You're going to be treated the

same when you're dead, and not just by God who doesn't care if you're rich or powerful or a senator's son."

■■ Notwithstanding defendant's assertions of prejudicial error, the comments made by the prosecutor were not improper. The purpose of an opening statement is to inform the finder of fact what the evidence will show. (*People v. Warmack* (1980), 83 Ill. 2d 112, 125, 413 N.E.2d 1254.) It is improper, however, for the prosecutor to comment on testimony which will be introduced and then fail to introduce that evidence. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38.) In the instant case, the statements made during opening statement were clearly comments upon the evidence the prosecutor intended to introduce at trial, and which later was introduced. The evidence at trial showed that defendant threatened one person with the loss of his job and another with the loss of his tavern, and that he told the police that they would be in trouble, but for the fact that his father was in Florida. The record does not indicate that, as defendant argues, the prosecutor's remarks were intended to inflame the passions of the jury (see *People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275), but rather, indicates that the remarks were merely comments upon the evidence introduced later at trial. Similarly, the prosecutor's statements in closing argument properly commented upon the evidence introduced at trial and drew legitimate inferences therefrom. *People v. Rader* (1988), 178 Ill. App. 3d 453, 468, 532 N.E.2d 1365.

■■ Defendant also asserts that the State violated an *in limine* order excluding testimony about a saying on the T-shirt that defendant wore on the day of the shooting, reading, "Gun Control Means Being Able to Hit the Target." The court found that the T-shirt's message was "highly inflammatory" and thus barred it.

At trial, the prosecutor asked defendant, "Now, without saying what was on [your T-shirt], did it have a saying on it?" The court sustained defense counsel's objection and the prosecutor continued with a different line of questioning. Defendant attaches reversible error to this one reference to the T-shirt.

While it is improper to refer to evidence which has been excluded (*People v. Burton* (1978), 63 Ill. App. 3d 915, 919, 380 N.E.2d 929), the prosecutor's question in the instant case did not violate the motion *in limine*; it merely asked whether defendant was wearing a T-shirt with a saying. Defendant's argument that the jury necessarily concluded that the saying was harmful to defendant's case does not follow.

Because none of the complained-of remarks, taken singularly or as a whole, constituted reversible error, defendant's argument must fail. *People v. Estes*, 127 Ill. App. 3d at 650.

## IV

Defendant lastly contends that he was denied his sixth amendment right to confrontation due to the nonproduction of a witness at trial. The State responds that defendant was not prejudiced by the nonproduction because another witness' testimony established exactly the same information.

In the instant case, Walensky testified that he met attorney Robert Cooley, whom he had seen at the police station on behalf of defendant, at a restaurant four to five days after the shooting. There, Walensky offered to change his testimony for $200,000. Unknown to Walensky, at the time of the meeting, Cooley was an informant for the Federal government and the meeting was the subject of government memos.

Thereafter, the defense requested production of both the memos and Cooley, later serving subpoenas on the United States Attorney's Office. Defense counsel was told that Cooley's production would be difficult because he was in protective custody. The memos, stating in summary form the events of the meeting, however, were tendered to the defense on March 7, 1990. The memos were not prepared by Cooley; rather, they were summaries prepared by the government.

Two days before the commencement of trial, on April 20, 1990, the attorneys met at the office of the United States Attorney. Counsel for defendant was told that Cooley was available on the telephone and, with the other attorneys present, spoke with Cooley. Cooley refused to discuss the case, but stated that, if put on the witness stand, he would talk. Cooley, upon further questioning, however, stated that the memoranda made about the meeting were "basically correct" and that "I could not help either side. I know nothing in addition to what you know." Cooley was never produced as a witness, despite a circuit court order entered on January 25, 1990, compelling his production.

The confrontation clause of the sixth amendment guarantees the right of a criminal defendant to be confronted by the witnesses against him, essential to which is the right to test the truth of their assertions through cross-examination at trial. (*Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065.) For purposes of the confrontation clause, a "witness against a defendant" is one whose testimony is part of the body of evidence which the jury may consider

in determining his guilt or innocence. *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702.

In the case at bar, defendant asserts that there is "no question of the Defendant's need to call Robert Cooley" and argues that the fact that Walensky testified about his meeting with Cooley does not mitigate the prejudice suffered. He maintains that the record indicates "that more information was available than what the government chose to tender or what Walensky chose to say at trial." He does not, however, say what that information might be.

Despite defendant's assertions, it is what he was allowed to do, not what he was prohibited from doing, that is important; "[t]he issue under the confrontation clause is whether the jury has been made aware of adequate factors to determine whether the witness is worthy of belief [citation], not whether any particular limitation has been placed upon defendant's ability to cross-examine a witness or whether the jury has knowledge of any specific fact." (*People v. Hines* (1981), 94 Ill. App. 3d 1041, 1048, 419 N.E.2d 420.) Where the entire record reflects that the jury was apprised of adequate factors concerning relevant areas of impeachment, no constitutional issue arises merely because defendant was prohibited from pursuing an area of inquiry. *People v. Hines*, 94 Ill. App. 3d at 1048.

■ Accordingly, defendant's contention that his rights were violated by his inability to impeach Walensky's testimony with Cooley's testimony must fail. Not only did Walensky testify as to everything that occurred between Cooley and him, but Cooley himself stated to defense counsel that he could not provide any more information than what the attorneys already knew. Because the jury was apprised of Walensky's attempts at extorting money from defendant's father through Cooley, we find that defendant's right to confrontation was not violated.

Based upon the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.