Harry ALEMAN, Petitioner–Appellant,

v.

THE HONORABLE JUDGES OF THE CIRCUIT COURT OF COOK COUNTY, Criminal Division, Illinois, Honorable Michael P. Toomin, Judge Presiding, Honorable Richard Devine, State's Attorney of Cook County, Illinois, Ernesto Velasco, Executive Director, Cook County Department of Corrections, Respondents–Appellees.

No. 97–2479.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1997.

Decided March 6, 1998.

Allan A. Ackerman, Chicago, IL, David I. Bruck (argued), Columbia, SC, for Harry Aleman.

Rita M. Novak, Office of the Attorney General, Chicago, IL, James E. Fitzgerald, John Blakey, Cook County State's Attorney, Chicago, IL, Renee G. Goldfarb (argued), Office of the State's Attorney of Cook County, Criminal Appeals Division, Chicago, IL, for Circuit Court of Cook County, Illinois, Criminal Division, Michael P. Toomin, Judge, and Ernesto Velasco.

James E. Fitzgerald, John Blakey, Cook County State's Attorney, Chicago, IL, Renee G. Goldfarb (argued), Office of the State's Attorney of Cook County, Criminal Appeals Division, Chicago, IL, for Richard A. Devine.

Before WOOD, Jr., COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Harry Aleman successfully bribed a Cook County Circuit Judge to acquit him of a murder charge in a 1977 bench trial. A grand jury returned a second indictment against Aleman on this murder charge in 1993 after evidence of the bribery surfaced. In addition, Aleman was indicted for the first time on a different murder charge. Aleman moved to dismiss both indictments, but the Illinois state courts rejected his arguments. In a lastditch effort to avoid (re)trial, Aleman requested a stay of state court proceedings while a federal district court considered his challenge to the indictments in a petition for a writ of habeas corpus. The case proceeded to trial after the district court denied this petition and motion to stay, and a Cook County jury convicted him of the Logan murder;[1] the trial judge thereafter sentenced Aleman to 100–300 years in prison. Aleman appeals the district court's denial of the petition. His conviction will stand, though, because we affirm the district court's denial of Aleman's petition.

## I. BACKGROUND

While walking to work on the morning of September 27, 1972, William Logan was shot and killed by Harry Aleman. Three years later, in October 1975, Aleman also shot and killed Anthony Reitinger, allegedly because Reitinger neglected to pay a "street tax"[2] on his bookmaking operation to local organized crime figures. A grand jury indicted Aleman for the Logan murder in December 1976, but he was not charged at this time with the Reitinger murder. After numerous substitutions of counsel and judges, the Logan case proceeded to a bench trial before Cook County Circuit Court Judge Frank Wilson, who acquitted Aleman of the Logan murder in May 1977.

Nearly twenty years after the trial, however, two witnesses from the Federal Witness Protection Program were made available to testify that Aleman had murdered both Logan and Reitinger and that he had purchased the Logan acquittal with a $10,000 bribe to Judge Wilson. The first witness, Vincent Rizza, was a former Chicago police officer who ran an illegal bookmaking operation in order to supplement his government salary. Rizza paid a street tax to the local mafia and agreed to report bookmakers who were not making such payments to Aleman; one of the independent bookmakers whom Rizza offered

---

1. The State has chosen not to proceed against Aleman on the Reitinger murder charge.

2. Street taxes are monies paid to criminal organizations in exchange for protection of the "taxpayer's" illegal operations from either law enforcement interference or mob takeover.

up to Aleman was Anthony Reitinger. This evidence would provide a crucial link between Aleman and Reitinger's unsolved murder.

Rizza also supplied corroboration of Aleman's bribe of Judge Wilson in the Logan murder trial. In the early winter of 1977, after Aleman's indictment but before the trial, Aleman told Rizza that the trial was "all taken care of". Aleman said that he requested a bench trial "because the case was all taken care of" and that this way he was not going to jail. Later, when newspaper accounts began to paint a bleak picture of Aleman's chances of gaining an acquittal, he again told Rizza calmly that the case was "taken care of".

The second federal government informant was Robert Cooley, a former lawyer steeped in corruption who admitted that he frequently bribed judges, prosecutors, clerks, and sheriffs before entering the Federal Witness Protection Program.[3] Cooley was a close friend of Judge Wilson and, at the request of some local organized crime figures, pitched the idea of a "fix" to Wilson. Cooley told Wilson that the case against Aleman was weak, that it could be handled very easily, and that an acquittal would be worth $10,000. Wilson agreed to fix the case if Aleman's counsel, Thomas Maloney, a good friend of Wilson's, would withdraw from the case in order to reduce the appearance of impropriety.[4] Cooley thereupon paid Wilson $2,500, and the two men agreed that Wilson would receive the remaining $7,500 after the acquittal. Unbeknownst to Wilson, Cooley had also arranged a $10,000 payment to secure the favorable testimony of an eyewitness to the murder. Cooley then met with Aleman and assured him that an acquittal was guaranteed.

The evidence against Aleman, however, was not as flimsy as Cooley had indicated to

Judge Wilson. After the second day of trial, Cooley met with Wilson, who was upset at Cooley's misrepresentations and at the prosecutor's allegations that a witness had received $10,000 in exchange for offering false testimony. Amazingly, the issue for Wilson was not *whether* he would still acquit Aleman, but for *how much*. Wilson expressed annoyance that a witness was getting the same amount of money as a "full circuit judge"; he said to Cooley that he would "receive all kinds of heat" for the acquittal and requested more bribe money: "[T]hat's all I get is ten thousand dollars? I think I deserve more."

Throughout these meetings, the acquittal itself was never in question. Judge Wilson fulfilled his end of the bargain on May 24, 1977, when he acquitted Aleman in a brisk oral ruling and quickly exited the courtroom. Cooley's contacts in organized crime gave him a $3,000 "commission" for his work and an envelope containing $7,500 for Judge Wilson. Cooley and Wilson dined together at a restaurant soon after the trial, and, in the men's room, Cooley slipped Wilson the promised $7,500 envelope. Wilson expressed concern because the press was "all over" him about the seemingly inexplicable acquittal; he complained to Cooley: "That's all I'm going to get? I don't get any more than that?" Wilson then left the restaurant in frustration.

In addition to this extraordinary informant testimony, other evidence confirmed the bribery. An F.B.I. agent interviewed Judge Wilson at his retirement home in Arizona in November 1989. The agent informed Wilson that Cooley had become a government informant, that Cooley had secretly taped a recent conversation with Wilson in which the two men discussed the $10,000 Aleman bribe, and that the Government was currently investigating allegations that Wilson accepted a

---

**3.** For a further discussion of Cooley's history of bribing public officials, see *United States v. Shields*, 999 F.2d 1090, 1093 (7th Cir.1993), cert. denied, 510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994).

**4.** This also required Aleman to revoke his motion for substitution of judges, in which he had claimed that he could not receive a fair trial under Judges Wilson and James Bailey. The

case was originally assigned to Judge Bailey, who had granted the motion and had transferred the case to Judge Fred Suria. After Wilson agreed to fix the case, Aleman revoked his motion for substitution and filed a motion to strike Judge Suria for cause. Judge Suria thereafter recused himself, and the case was transferred to Judge Wilson's docket.

bribe to acquit Aleman. Wilson denied the accusations, but he failed to appear in Chicago for a grand jury subpoena concerning the matter on December 6, 1989. A few months later, Judge Wilson walked into the backyard of his home and shot himself to death.

Finally, Monte Katz, a friend of Aleman's in federal prison,[5] claimed that Aleman admitted that he murdered William Logan. Katz and Aleman became friends in prison, and, apparently, Aleman often discussed his criminal exploits. Specifically, Aleman told Katz that he "fixed" the Logan trial by paying money to "reach" the judge. Aleman stated that he was not worried about being tried again for the murder because it "was a double jeopardy situation."

The Circuit Court noted that the circumstantial evidence of a bribe was also significant. The record revealed "the rather curious spectacle" of Aleman, who originally deemed Judge Wilson to be a prejudiced judge, within the passage of ten weeks, withdrawing his objection and allowing the case to be assigned to Wilson. In addition, Aleman was released from state custody on bond despite facing the state's most serious criminal charge, and the case proceeded to trial in less than five months from the date of his arraignment. The Circuit Court also took pause from the fact that Aleman's attorney, Frank Whalen, set the case for trial within six weeks of filing his appearance and requested no interim continuances to conduct the "adequate preparation one might reasonably anticipate in a case of this magnitude."

Based on this body of evidence, in December 1993, the Cook County State's Attorney again charged Aleman for the Logan murder and for the first time charged Aleman with the murder of Reitinger. A grand jury returned indictments on both counts. Aleman claimed to the Circuit Court, as he claims to us on appeal, that the Logan indictment violated the Double Jeopardy Clause and that the prejudicial pre-indictment delay on both charges violated his due process rights. After an evidentiary hearing concerning the alleged bribe, the Circuit Court rejected the

double jeopardy argument based on the overwhelming factual evidence that Aleman's first trial was a sham. The Court emphasized its certainty that Aleman had bribed Judge Wilson:

> Although the court earlier observed that the State's burden was to establish the bribery by a preponderance of the evidence, the court also concurs in the State's appraisal that the evidence presented also meets the standard of proof beyond a reasonable doubt. Were this a prosecution for the substantive offense of bribery, the court would have little difficulty in concluding that the People had presented a credible and coherent case against the defendant. The evidence clearly establishes the tendering of money to a public officer to influence him in the performance of his duties.

(Citations omitted). Based on this factual finding, the Circuit Court held that there was no double jeopardy bar to reprosecuting Aleman for the Logan murder because there was never any jeopardy at the first trial. Furthermore, because crucial witnesses were not available at an earlier time, the court denied Aleman's claims of unconstitutional preindictment delay. These rulings were upheld on appeal. *See People v. Aleman*, 281 Ill.App.3d 991, 217 Ill.Dec. 526, 667 N.E.2d 615 (Ill.App.), *review denied*, 168 Ill.2d 600, 219 Ill.Dec. 567, 671 N.E.2d 734 (1996), *and cert. denied*, — U.S. —, 117 S.Ct. 986, 136 L.Ed.2d 868 (1997). The district court below also rejected these contentions in Aleman's petition for a writ of habeas corpus. *United States ex rel. Aleman v. Circuit Court of Cook County*, 967 F.Supp. 1022 (N.D.Ill. 1997).

## II. DISCUSSION

Aleman raises three claims on appeal. First, he takes issue with the Circuit Court's factual findings that he bribed Judge Wilson in the Logan trial. Second, he challenges the effect of those factual findings upon his double jeopardy claim. *See Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d

---

5. Aleman is currently serving a 12–year federal prison term on racketeering charges. *See United States v. DiDomenico*, 78 F.3d 294 (7th Cir.), *cert.*

*denied*, — U.S. —, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996) (affirming Aleman and his codefendants' convictions).

707 (1969) (holding that the protections of the Double Jeopardy Clause apply to the states). Finally, he urges us to recognize that the pre-indictment delays of twenty-one and eighteen years in the Logan and Reitinger murders, respectively, violated his due process rights. Our collateral review, however, is quite limited. Under 28 U.S.C. § 2254(d)(1), we can only grant Aleman's petition if one of the Circuit Court's legal rulings was either "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." Aleman's factual challenge can succeed only if he can show by "clear and convincing evidence" that the Circuit Court's findings are erroneous. *See id.* § 2254(d)(2). He meets neither of these stringent standards.

## A. Double Jeopardy Claims

■■ Aleman's challenge to the Circuit Court's factual findings can be dismissed in short order. He rightly points out that the common law has always presumed the neutrality of judges. *See, e.g.,* 3 W. BLACKSTONE, COMMENTARIES *361 ("[T]he law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea."); *see also Del Vecchio v. Illinois Dep't of Corrections,* 31 F.3d 1363, 1372–73 (7th Cir.1994) (applying the common-law presumption), *cert. denied,* 514 U.S. 1037, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995). Aleman seems to think that reciting this principle alone can somehow overcome the great weight of evidence showing that he bribed Judge Wilson. However, we have always recognized that the presumption of a judge's neutrality is a rebuttable one. *See Del Vecchio,* 31 F.3d at 1373; *see also Bracy v. Gramley,* —— U.S. ——, ——, 117 S.Ct. 1793, 1799, 138 L.Ed.2d 97 (1997). As in *Bracy,* the Circuit Court found that the ordinary presumption had been soundly rebutted in this case.

Beyond the presumption argument, Aleman argues that the State's witnesses were unreliable based solely on the length of time between the relevant events and the Circuit Court's evidentiary hearing. He relies on

dicta from our decision in *Bracy v. Gramley,* 81 F.3d 684, 693 (7th Cir.1996), in which we commented that the petitioner did not show "good cause" for discovery because, in part, there would be a "pall of doubt" over the reliability of any exculpatory witnesses' testimony based on a fourteen-year interval between the events and an evidentiary hearing. *Id.* The Supreme Court, however, implicitly expressed its disapproval of this statement when overruling the case. *See* —— U.S. ——, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Aleman nevertheless tries to spin gold from this frayed strand. He notes that most of the key players in this story are deceased and, of those that are still living, the events occurred so long ago that their testimony is inherently unreliable.

Aleman's position on this point is flawed on many levels. First, the Supreme Court disagreed with our view of Bracy's ability to show good cause based on such testimony. Second, dicta from our *Bracy* opinion would not have established any sort of general rule that testimony concerning events from over fourteen years ago was presumptively unreliable. Such a rule would have called into question the constitutionality of countless statutes of limitations. Third, and most importantly, any alleged presumption of unreliability would have been rebutted in this case by the Circuit Court's evaluation of the testimony. The Court heard the evidence and concluded that it was reliable "beyond a reasonable doubt". Aleman did not attempt to rebut the State's strong evidence with anything but vacuous and inapposite presumptions. This is a far cry from the "clear and convincing evidence" of factual error that we require before invalidating Circuit Court findings of fact.

■■ Aleman's legal challenge presents a unique and interesting question, but it ultimately fares no better than his factual one. The Fifth Amendment's Double Jeopardy Clause guarantees that no one shall "be subject for the same offence to be twice put in jeopardy of life or limb." Aleman argues that the Double Jeopardy Clause unambiguously bars his reindictment on the Logan murder charge because he faced trial on that murder charge in 1977 and was acquitted by

Judge Wilson. In support of his position, he points to a long line of Supreme Court cases reiterating that an acquittal on a charge absolutely bars retrial on that charge. *See, e.g., Arizona v. Washington,* 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978) ("The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal.... If the innocence of the accused has been confirmed by a final judgment, the Constitution conclusively presumes that a second trial would be unfair."); *Ball v. United States,* 163 U.S. 662, 671, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896) ("[I]n this country a verdict of acquittal ... is a bar to a subsequent prosecution for the same offense."). Aleman argues that it is irrelevant *how* he obtained his acquittal and that there is no room for courts to question those circumstances and lift the double jeopardy bar to reprosecution. *See, e.g., Burks v. United States,* 437 U.S. 1, 11 n. 6, 98 S.Ct. 2141, 2147 n. 6, 57 L.Ed.2d 1 (1978) ("[W]here the Double Jeopardy Clause is applicable, its sweep is absolute. There are no 'equities' to be balanced, for the Clause has declared a constitutional policy, based on grounds which are not open to judicial examination."); *Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962) (stating that an acquittal triggers the protections of the Double Jeopardy Clause even if "the acquittal was based upon an egregiously erroneous foundation"). Aleman contends that the Circuit Court's decision is contrary to, or an unreasonable application, of this body of the Supreme Court's interpretations of federal law.

The legal conclusion urged by Aleman might not be an unreasonable application of Supreme Court precedent,[6] but the highly deferential standard of collateral review leads us to hold that the contrary interpretation—the one adopted by the Illinois courts in this case—is also not unreasonable. The Illinois courts viewed the authority cited by Aleman as begging the question; the Double Jeopardy Clause may well be absolute when it applies, *see Burks,* 437 U.S. at 11 n. 6, 98

S.Ct. at 2147 n. 6, but determining if it applies is the real issue in this case. Similarly, the State argues that the protections of the *Double* Jeopardy Clause only extend to a defendant who was once before in jeopardy of conviction on a particular criminal charge; the State contends that, by bribing Judge Wilson, Aleman created a situation in which he was never in jeopardy at his first trial. The first trial, therefore, was a sham and the acquittal there rendered has no effect for double jeopardy purposes. Under this theory, the State was free to re-indict him because he has never been in jeopardy of conviction on the Logan murder charge.

The Circuit Court concluded that Aleman's first trial was a nullity because he was never truly at risk of conviction. The Supreme Court has emphasized that "[j]eopardy denotes risk. In the constitutional sense, jeopardy describes the risk that is traditionally associated with criminal prosecution." *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975); *see also United States v. Martin Linen Supply Co.,* 430 U.S. 564, 569, 97 S.Ct. 1349, 1353–54, 51 L.Ed.2d 642 (1977) ("The protections afforded by the [Double Jeopardy] Clause are implicated only when the accused has actually been placed in jeopardy.") (emphasis added); *Serfass v. United States,* 420 U.S. 377, 391–92, 95 S.Ct. 1055, 1064–65, 43 L.Ed.2d 265 (1975) ("Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy.... In particular, it has no significance in this context unless jeopardy has once attached and an accused has been subjected to the risk of conviction."); *Price v. Georgia,* 398 U.S. 323, 331, 90 S.Ct. 1757, 1762, 26 L.Ed.2d 300 (1970) ("The Double Jeopardy Clause, as we have noted, is cast in terms of the risk or hazard of trial and conviction, not of the ultimate legal consequences of the verdict."). Indeed, the Court has stated that preventing the hazards associated with risking conviction is the *raison d'etre* of the Double Jeopardy Clause:

---

**6.** This case has inspired at least two scholarly commentaries reaching opposite conclusions. See Anne Bowen Poulin, *Double Jeopardy and Judicial Accountability: When is an Acquittal Not* *an Acquittal?,* 27 Ariz. St. L.J. 953 (1995); David S. Rudstein, *Double Jeopardy and the Fraudulently-Obtained Acquittal,* 60 Mo. L.Rev. 607 (1995).

The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957).

Aleman had to endure none of these risks because he "fixed" his case; the Circuit Court found that Aleman was so sanguine about the certainty of his acquittal that he went so far as to tell Vincent Rizza before the trial that jail was "not an option". Aleman may be correct that some risk of conviction still existed after Judge Wilson agreed to fix the case, but it cannot be said that the risk was the sort "traditionally associated" with an impartial criminal justice system.[7] *See Breed,* 421 U.S. at 528, 95 S.Ct. at 1785. It seems only appropriate that a defendant should not be allowed to escape punishment for murder because he bribed the judge. To allow Aleman to profit from his bribery and escape all punishment for the Logan murder would be a perversion of justice, as well as establish an unseemly and dangerous incentive for criminal defendants. The Illinois courts' holdings, therefore, were not contrary to, or unreasonable applications of, federal law as interpreted by the Supreme Court.

For these reasons, we affirm the district court's rejection of the double jeopardy claims contained in Aleman's petition.

7. At oral argument, Aleman's counsel ominously forecast that the Illinois courts' rulings would lead to a plethora of *"Aleman* hearings" in which the State would assail the *extent* of the jeopardy to which a defendant was subjected in order to gain another bite at the proverbial apple. Let us be clear that we do not countenance the expansion of our (or the Illinois courts') holding in such a manner. Our holding is crafted to the unique circumstances of the instant case.

8. Aleman also argues that the indictments violated his Sixth Amendment right to a speedy trial.

### B. Pre-indictment Delay

The Supreme Court has recognized that, in extraordinary circumstances, the Fifth and Fourteenth Amendments' Due Process Clauses protect a defendant from oppressive and prejudicial preindictment delays. *See United States v. Lovasco,* 431 U.S. 783, 789–90, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977). Aleman urges us to invalidate his indictments for the Logan and Reitinger murders on this basis.[8] A grand jury indicted Aleman on both murder charges in December 1993, which was more than 21 years after Logan's murder and over 18 years after Reitinger was shot to death. In order to succeed on his due process claim, Aleman must show that the delay caused him actual and substantial prejudice. *See United States v. Sowa,* 34 F.3d 447, 450 (7th Cir. 1994), cert. denied, 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995). If he makes that difficult showing, the Government must come forward with a justification for the delay, which the court will then balance against the prejudice established by Aleman. *See United States v. Canoy,* 38 F.3d 893, 902 (7th Cir.1994). Neither the Supreme Court nor our Circuit has ever held a pre-indictment delay to be unconstitutional, and Aleman's case will not be the first.

Aleman does not clear the initial, high hurdle of establishing actual and substantial prejudice from the pre-indictment delay. He again relies on presumptions instead of facts; he claims that he should enjoy a "presumption of prejudice" because, in the Sixth Amendment context, the Supreme Court has vacated a conviction in which a defendant did not receive a trial for more than eight years after his indictment. *See Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120

The Supreme Court, however, has held that this constitutional guarantee applies only to delays following arrest or indictment; the Sixth Amendment does not apply to investigative delays before that point. *See United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971) ("[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.").

L.Ed.2d 520 (1992). Reasoning by strained analogy, he argues that we should similarly presume prejudice in the due process context from a longer, *pre-indictment* delay.

Aleman's argument, however, is based on a number of faulty premises, most notable of which is that there is no difference between a pre-indictment and post-indictment delay. The Supreme Court has explained that post-arrest and/or post-indictment delays deserve close scrutiny because a defendant will likely be incarcerated during the time before his trial and will all the while carry the social stigma that accompanies public accusation without the chance to clear his name. *See Marion*, 404 U.S. at 321–22, 92 S.Ct. at 464. These dangers are simply not present in this case of pre-indictment delay. Furthermore, he makes the mistake of urging us to recognize a conclusive presumption in a due process inquiry, which the Supreme Court has frequently emphasized should be flexible and highly fact-specific. *See, e.g., Adamson v. California*, 332 U.S. 46, 68, 67 S.Ct. 1672, 1683–84, 91 L.Ed. 1903 (1947) (Frankfurter, J., concurring) ("These standards of justice are not authoritatively formulated anywhere as though they were prescriptions in a pharmacopoeia.").

■ Most importantly, Aleman's attempt to rely on a "presumption of prejudice" ignores our Circuit's law that "it is not enough ... to offer some suggestion of speculative harm; rather, the defendant must present concrete evidence showing material harm" to his ability to secure a fair trial. *United States v. Anagnostou*, 974 F.2d 939, 942 (7th Cir.1992), cert. denied, 507 U.S. 1050, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993). It is not enough simply to speculate—as Aleman does here—that witnesses' memories might have faded because of the passage of time. In order to establish prejudice for due process purposes, a defendant's "allegations of prejudice must be specific, concrete and supported by the evidence-vague, speculative, or conclusory allegations will not suffice." *Canoy*, 38 F.3d at 902 (quotation omitted). Aleman claims without specific examples that the death of many key players in his alleged bribery and the substantial amount of time between the events and his upcoming trial would hinder his ability to present a defense. This is nothing more than the kind of bald speculation that we have consistently rejected.

■ Aleman cannot establish the prejudice we require to proceed further with our due process inquiry. Even if he did, though, the State would have been able to show compelling justifications for the significant pre-indictment delay. Aleman takes the odd and untenable position of criticizing the State for not discovering his bribery of Judge Wilson sooner. Yet the crucial witness to that fact-Robert Cooley—was hidden in the Federal Witness Protection Program until he became available as a witness to the Cook County State's Attorney in 1993. *Cf. People v. Savickas*, 230 Ill.App.3d 322, 171 Ill.Dec. 713, 594 N.E.2d 1233, 1242 (rejecting a defendant's Confrontation Clause challenge to the admission of Cooley's testimony despite the fact that Cooley's protective custody prevented the State from producing him as a witness at trial), *review denied*, 146 Ill.2d 646, 176 Ill.Dec. 816, 602 N.E.2d 470 (1992). Aleman was reindicted for the Logan murder soon after Cooley became available. On the Reitinger charge, federal prosecutors originally included the murder as a predicate offense in Aleman's 1990 RICO prosecution, but they did not have enough evidence on which to base a separate criminal charge for the offense; this predicate offense was eventually struck from Aleman's plea agreement. State prosecutors likewise recognized the weakness of charging Aleman with Reitinger's murder until federal officials made Vincent Rizza available from the Federal Witness Protection Program in 1993. In short, even if Aleman had sufficiently proven prejudice, his due process claim would have failed because the State did not intentionally delay prosecution in order to gain a tactical advantage. We affirm the district court's denial of the due process component of Aleman's petition.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Aleman's petition for a writ of habeas corpus.