THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HARRY ALEMAN, Defendant-Appellant.

First District (2nd Division)   No. 1—95—1282

Opinion filed June 18, 1996.

Allan Ackerman and Adam Brenner, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Patrick

Quinn, Scott Cassidy, Michael Golden, and Susan Schierl, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant Harry Aleman appeals the circuit court's order denying his motion to dismiss two murder indictments against him. The procedural history of these indictments is unusual and requires extensive recountal for fuller understanding of the issues presented in this appeal.

On September 27, 1972, Billy Logan was shot to death on West Walton Street in Chicago, for which Aleman was indicted in December 1976. Following a bench trial in May of 1977, he was acquitted. In October of 1975, Anthony Reitinger was shot to death near Taylor Street in Chicago. A grand jury indicted Aleman for both murders in December 1993, over 15 years later.

Aleman moved to dismiss the indictments based upon considerations of double jeopardy, speedy trial and estoppel. The State countered that Aleman's 1977 trial was a nullity by virtue of a $10,000 judicial bribe to acquit him; therefore, double jeopardy is inapplicable.

The circuit court issued an "interim ruling" in October 1994, denying dismissal of the indictments and finding no legal impediment to trial, provided the State could prove the 1977 bribery. Entry of a final order was stayed until an evidentiary hearing could be held with respect to that alleged bribery. Aleman's motion to make the interim ruling final was denied on October 19, 1994.

Supreme Court Rule 604(f) (134 Ill. 2d R. 604(f)) interlocutory review sought by Aleman on October 26, 1994, was dismissed by this court. The Illinois Supreme Court denied Aleman's motion for a Supreme Court Rule 383 (134 Ill. 2d R. 383) supervisory order on January 6, 1995.

The circuit court evidentiary hearing proceeded on February 9, 1995, over Aleman's objection. On March 9, 1995, the court entered a supplemental and final ruling, finding sufficient evidence to establish that Judge Frank Wilson had been bribed during the 1977 trial, and denied Aleman's motion to dismiss the indictments.

The issues raised in this appeal include whether the circuit court (1) possessed jurisdiction to conduct the 1995 evidentiary hearing; (2) erred in denying Aleman's motion to dismiss the indictments by reason of double jeopardy; (3) erred in conducting the evidentiary hearing; (4) improperly ordered the indictments to stand in violation of his right to a "speedy prosecution" and speedy trial under the Illinois

and United States Constitutions; (5) erred in finding that he was an active participant in the bribery scheme; and (6) improperly refused to immunize a proposed defense witness. Issues (1) and (2) will be considered in this opinion; issues (3) through (6) will be determined in a separate Supreme Court Rule 23 order disseminated contemporaneously.

Evidence adduced at the 1995 evidentiary hearing would permit a fact finder to believe the following. After Aleman was indicted in December 1976, his case was placed on the trial call of Cook County Circuit Judge James Bailey. His then attorney, Thomas J. Maloney, petitioned to substitute judges, naming Judges Bailey and Wilson, asserting that Aleman would not receive a fair trial before either of them. His motion was granted; the cause was transferred and reassigned to Judge Fred Suria. On March 8, 1977, Judge Suria recused himself from the case.

Aleman's cause was then assigned to Judge Wilson, who on March 22, 1977, granted his motion to withdraw Wilson's name from the earlier petition for substitution of judges. Maloney's motion to withdraw as Aleman's counsel was granted and Frank Whalen filed his written appearance as defense counsel on April 3, 1977.

Vincent Rizza, a former Chicago police officer, testified that during the end of 1974 and the beginning of 1975, while he was still an officer, one of his bookmaking operations was raided by the police. Rizza met Aleman, Jimmy Inendino and Johnnie Mancella in the spring or summer of 1975, and was told by Aleman that he owed $40,000 in back "street taxes," plus $1,000 per month thereafter for his bookmaking operation. "Street taxes" are monies paid to members of organized crime in order to protect the existence of the illegal operation.

Following Aleman's intrusion into Rizza's illicit business, Rizza met with Angelo LaPietra who, according to Rizza, also had ties to organized crime. LaPietra's negotiations permitted Rizza to pay Aleman $1,000 in street taxes plus a couple hundred dollars per month for office expenses. Aleman and Inendino would cover all operation losses and the profits would be split. As part of the deal, Rizza also had to report other independent bookmakers to Aleman. One such independent bookmaker was Anthony Reitinger.

Rizza did not pay street taxes directly to Aleman after May of 1976, but continued to pay them to Joseph Ferriola, identified as Aleman's uncle. In the early winter of 1977, Aleman told Rizza that his murder indictment "was all taken care of," and that "committing murder in Chicago was okay if you killed the right people." He later told Rizza that he was going to request a bench trial "because the

case was all taken care of"; going to jail was not an option; and he was not going to jail. Still later, Aleman told Rizza the case was going "fine." Rizza noted that the newspapers were crucifying him and the case looked bad. Aleman responded that the case was "taken care of."

On cross-examination, Rizza admitted that he had used cocaine frequently during the late 1970s and that he had committed perjury as a Chicago police officer and in his federal criminal drug case. Rizza stated that he had been in the Federal Witness Protection Program during the 1980s.

The parties then stipulated that pursuant to a 1990 federal prosecution, Aleman pled guilty to engaging in illegal activities with "the Ferriola street crew," which was controlled by "the Outfit," an organized criminal group which collected wagers on sporting events and street taxes from independent bookmakers. He told attorney Robert Cooley to find independent bookmakers who were not paying street taxes and to place bets with them; if Cooley lost, Aleman would "grab" the bookmakers. Aleman's plea also admitted that Rizza operated a gambling business and paid $500 to $1,000 per month in street taxes to him and Inendino. He told Rizza to locate any independent bookmakers and tell them "Joe Nagel," Ferriola's nickname, had sent him. In the federal plea agreement, Aleman denied any participation in Reitinger's murder or Judge Wilson's bribery. He was sentenced to 12 years in prison.

Cooley, a former Chicago police officer and an attorney associated with the law firm of Cooley, DeLeo, and D'Arco, testified that during the time he practiced criminal law, he frequently bribed judges, prosecutors, clerks and sheriffs. In 1986, Cooley began working for the United States Attorney's office as an undercover informant.

In February 1977, Cooley met first ward figures Pat Marcy and John D'Arco, Sr. Marcy asked Cooley if he "had a judge at 26th Street who could handle or take care of a case," one who would fix Aleman's case. Cooley knew of Aleman's reputation as the main enforcer for the mob in Chicago.

When Cooley ran into Judge Wilson, a close friend, he told Wilson of the approach to "handle" Aleman's case. Wilson informed Cooley that he had been "SOJ'd" (substitution of judge) on the case. Cooley later told Wilson the case was weak, it could be handled very easily, and that Cooley would pay him $10,000 for an acquittal. After Cooley again met Wilson, the latter agreed to handle the case if Maloney, Aleman's attorney, would withdraw because he and Maloney were friends. Cooley then gave $2,500 to Wilson, the remaining $7,500 to be paid when the trial was over.

After paying Wilson initially, Cooley met Marco D'Amico and Aleman. Cooley assured Aleman that the case had been fixed; the judge would acquit him. Cooley then met Frank Whalen in a loop hotel in April 1977. Cooley told Whalen that he knew what he was doing, the judge was going to throw the case out, and the judge did not want to have any contact with Whalen. Cooley would act as middleman. Whalen agreed.

Cooley met Aleman with Butch Petrocelli, Aleman's "partner on a lot of hits," present. Aleman informed Cooley that his brother, Anthony, contacted a female witness to the Logan murder, who would accept $10,000 to testify that he had not done the shooting. Cooley later informed Judge Wilson about this witness; Wilson thought that was a good idea. Cooley did not inform Wilson of the $10,000 witness payment. Cooley then met Whalen in Florida a week before the trial and again assured him that Wilson would throw the case out.

On the second day of trial, Judge Wilson and Cooley met. Wilson was very upset and voiced his concern that the case was not as weak as Cooley had initially represented. The next day, Cooley told Marcy of this development. Marcy responded that Wilson had "better do what he's supposed to do."

Cooley met Wilson again. Wilson was even more upset this time because the prosecutors had informed him that a witness was receiving $10,000 for testifying falsely. Wilson was amazed that he was only receiving $10,000 although he was a "full circuit judge." Wilson explained that he may lose his job and asserted, "that's all I get is ten thousand dollars? I think I deserve more." Wilson blamed Cooley because he would receive "all kinds of heat" for this trial. He again requested more bribe money. Cooley told Wilson he would see what he could do. Wilson never expressed any intention not to fulfill his end of the deal. Cooley would pay Wilson the remaining $7,500 after the trial. Cooley met with Marcy again, who told him that Wilson "won't get a nickel more."

On May 24, 1977, Judge Wilson acquitted Aleman of Logan's murder. After the trial, Marcy gave Cooley two envelopes: one contained $7,500 for Wilson and the other held $3,000 for Cooley. That evening, Cooley and his secretary met Wilson at a restaurant. In the men's room, Cooley gave Wilson the $7,500. Wilson was upset because the press was "all over" him and complained, "That's all I'm going to get? I don't get any more than that?" Wilson then left.

A few weeks later, Aleman told Cooley that he had done a great job and asked for some business cards so that he could send him more business.

On cross-examination, Cooley testified, among other things, that he is paid $3,400 per month by the government.

Aleman introduced an FBI report prepared by Special Agent John Bowen on March 1, 1989, following an interview with Cooley. Bowen's report indicated that Cooley asked Marcy to remove Maloney from defendant's 1977 murder trial because Cooley did not like him. The report also indicated that Cooley had been given a $2,500 advance from Marcy to "lock him [Wilson] in on the case."

The parties stipulated that Cooley's secretary testified during a federal trial that she was with Cooley when he met Judge Wilson following Aleman's 1977 trial; Wilson looked very sad and said, "You look like a nice young girl. Stay away from [Cooley]."

Edward Whalen testified at the evidentiary hearing. He was Frank Whalen's nephew and often helped his uncle with cases, including Aleman's 1977 murder trial. His uncle never stayed at a loop hotel, as Cooley claimed. Edward never came into contact with Cooley during this time. Neither Frank Whalen nor Aleman ever indicated to Edward that the case had been predetermined. Edward never met Pat Marcy, John D'Arco, Sr., or John D'Arco, Jr., and never saw Judge Wilson outside of the courtroom.

On cross-examination, Edward identified a transcript of an *in camera* proceeding of Aleman's murder trial regarding the defense motion *in limine* to bar certain testimony of a witness. The assistant State's Attorney there made an offer of proof that twice during the winter, Aleman's brother had offered a witness money to testify she saw someone other than him "get out of the hit car." In January, 1977, Aleman told the witness, "it would be worth $10,000" if the witness would testify that she saw someone other than defendant "get into the hit car." Following the *in camera* proceeding, Judge Wilson ruled that the testimony was inadmissible because "it would be very prejudicial, it's hearsay, obviously no basis." In a statement to the FBI in 1990, that witness denied having seen any cars on the night Logan was murdered or being offered money in connection with her testimony.

The parties stipulated that FBI Agent Francis Marrocco would testify that he interviewed Judge Wilson at his home in Sun City, Arizona, on November 30, 1989. Marrocco there informed Wilson that Cooley had been cooperating with the federal government and had recorded one of his recent conversations with Wilson. Marrocco also told Wilson that the government was investigating Logan's murder and Aleman's subsequent trial in which the government believed Wilson had accepted a bribe from Cooley for an acquittal. Wilson declined to hear the recorded conversation and denied having accepted $10,000 to acquit Aleman. Marrocco then served Wilson with a grand jury subpoena for a December 6, 1989, appearance in Chicago, but he failed to appear.

Judge Wilson's body was discovered in his backyard on February 5, 1990, having sustained a single gunshot wound to his head. The cause of death was listed as suicide.

The parties further stipulated that Monte Katz testified at the federal sentencing hearing of Maloney, after Maloney had been convicted of federal racketeering charges, among others, in unrelated cases. Katz and Aleman were both incarcerated at the Metropolitan Correction Center and later at a federal correctional institution in Oxford, Wisconsin. Katz and Aleman became friends at the federal institution and Aleman often discussed crimes he had committed, including the Logan murder. Aleman recently had been reindicted for the Logan murder but he was unconcerned. Aleman showed Katz an ABA Law Journal article regarding the instant proceedings, asked Katz for his opinion, and then said that he had the original trial "fixed" by having his uncle, Joe Nagel, pay Marcy money to "reach" the judge. Aleman "wasn't worried" about being indicted because the case was too old and would not be won because it "was a double jeopardy situation." Katz informed the Cook County State's Attorney's office of these conversations on April 19, 1994.

The defense introduced Aleman's sworn affidavit into evidence in which he denied: (1) meeting with Cooley in 1977 "in or out of the presence of someone named Marco D'Amico"; (2) speaking with Cooley in connection with the Logan murder trial; and (3) participating "in any bribery of any judge" regarding his 1977 acquittal in the Logan murder.

On March 9, 1995, the circuit court in the present case filed its supplemental ruling denying Aleman's motion to dismiss the indictments. The court initially ruled that Cooley's testimony was admitted properly under the co-conspirator's exception, overruling Aleman's motion to strike. The court further concluded that the State sufficiently met its burden of producing proof that Aleman had participated in bribing Judge Wilson during his 1977 trial for the Logan murder; therefore, Aleman's motion to dismiss the indictments was denied for want of previous jeopardy. This appeal followed.

## I

Aleman initially contends that the circuit court proceedings were void because they were held prior to the issuance of the appellate mandate after his having filed a Supreme Court Rule 604(f) appeal, and thereafter sought Supreme Court Rule 383 relief, which stayed the appellate mandate under Supreme Court Rule 368(b).

## A

■ Supreme Court Rule 604(f) provides, in part, as follows:

"The defendant may appeal to the Appellate Court the denial of a motion to dismiss a criminal proceeding on grounds of former jeopardy." 134 Ill. 2d R. 604(f).

Although it is true that the proper filing of a notice of appeal divests the circuit court's jurisdiction and the jurisdiction of the appellate court attaches *instanter* (*Daley v. Laurie*, 106 Ill. 2d 33, 37, 476 N.E.2d 419 (1985)), the substantive effect· of an order controls its appealability. See *People v. Keith*, 148 Ill. 2d 32, 39, 591 N.E.2d 449 (1992); *People v. Rudi*, 103 Ill. 2d 216, 224, 469 N.E.2d 580 (1984); *People v. Bean*, 135 Ill. App. 3d 336, 339, 481 N.E.2d 888 (1985). More particularly, an order contemplating further proceedings is not final and, consequently, is not appealable. *People v. Heddins*, 66 Ill. 2d 404, 406, 362 N.E.2d 1260 (1977).

■ Aleman asserts that when he filed a Supreme Court Rule 604(f) notice of appeal, the circuit court was divested of its jurisdiction of the cause, relying upon *People v. Hiatt*, 229 Ill. App. 3d 1094, 595 N.E.2d 733 (1992), and *People v. Bean*, 135 Ill. App. 3d 336, 481 N.E.2d 888 (1985). Neither *Hiatt* nor *Bean* supports Aleman's assertion because neither of the respective circuit courts in those cases entered orders contemplating further proceedings, unlike the instant case. *Hiatt*, 229 Ill. App. 3d at 1095; *Bean*, 135 Ill. App. 3d at 341-42. The defendants in *Hiatt* and *Bean* were permitted to appeal under Supreme Court Rule 604(f) because the circuit courts entered orders denying motions to dismiss. In the case *sub judice*, the court's interim ruling specifically contemplated further proceedings, concluding: "The entry of a final order on the motion to dismiss will be stayed pending resolution of the factual issues." The court's ruling cannot be any clearer: a final order on Aleman's motion to dismiss indictments would not be entered until the underlying factual dispute was resolved.

Aleman correctly maintains that the substantive effect of an order governs its appealability. See *People v. Rudi*, 103 Ill. 2d 216, 224, 469 N.E.2d 580 (1984). He asserts that the interim ruling here, coupled with his concession concerning the bribery, render that ruling a final, appealable order. The alleged bribery concession is claimed to have been made at argument on August 23, 1994. The record is to the contrary. The circuit court, upon agreement of the parties, proceeded first to legal contentions in order to determine whether the current indictments violated double jeopardy and speedy trial principles. If Aleman's legal arguments were valid, the court reasoned, it would not have to hold an evidentiary hearing because the indictments would be barred by law. Aleman's alleged "concession" essentially was a stipulation, in the form of a demurrer, to the

State's proffered testimony. The August 23, 1994, proceeding was held, then, in order to address only the legal issues concerning defendant's motion to dismiss indictments.

This conclusion is buttressed by the circuit court's interim ruling which conditionally assumed, as did the August proceeding, the existence of the alleged bribery in order to address Aleman's legal arguments concerning double jeopardy. The court noted that its interim ruling was incomplete, however, for three reasons. First, the ruling was based upon the assumption that the State subsequently could prove the existence of the underlying bribery. Second, the record was insufficient because the court's interim ruling was "based not upon factual determinations, but rather upon what the facts are assumed to be, devoid of the contrary conclusions that might obtain were the assertions subjected to the legal machinery of confrontation or rebutted by other relevant evidence." Third, the court observed, "should the reviewing court affirm the conclusions reached herein, and then remand the matter for further consideration, [this] court would then be required to make factual findings which could then be the subject of yet another appeal before the issue of double jeopardy was finally resolved." An evidentiary hearing was ordered also to ensure that the proffered evidence would not lose its availability.

The circuit court's interim ruling was based neither upon any concession by Aleman to the alleged bribery of Judge Wilson nor upon any facts concerning that bribery. The court's ruling was not a final order from which a proper notice of appeal could be filed, but a court order which contemplated further proceedings and, as such, barred the initiation of any appeal. See *People v. Heddins*, 66 Ill. 2d 404, 406, 362 N.E.2d 1260 (1977).

Aleman's notice of appeal was not proper at this stage of the proceedings and, therefore, the circuit court was never divested of its jurisdiction to hold the evidentiary hearing.

B

Aleman next asserts that the circuit court was without jurisdiction to conduct the evidentiary hearing because he sought supreme court relief under Supreme Court Rule 383, which is claimed to have stayed automatically the appellate mandate under Supreme Court Rule 368(b).

Supreme Court Rule 368(b) provides, in part, as follows:
"In all other cases, the mandate is stayed automatically if, before it may issue, *a party who is entitled to seek review* by the Supreme Court *** files a petition in the Supreme Court for such review." (Emphasis added.) 155 Ill. 2d R. 368.
The italicized language clearly demonstrates that Rule 368(b) applies

only to parties who are *entitled to seek review*. Here, Aleman was not so entitled. His untimely efforts to obtain review did not ripen merely by having sought a supreme court supervisory order under Supreme Court Rule 383. 134 Ill. 2d R. 383. Significantly, supreme court refusal to grant supervisory relief requires no mandate to issue thereafter to any court. Aleman, himself, recognized the precipitate nature of his effort to appeal when he filed not only a motion in the circuit court, unsuccessfully, to have the interim order denoted final, but, in seeking supervisory review by the supreme court, he also filed a motion to stay the proceedings in the circuit court, which was denied on January 6, 1995. There would have been no need to stay proceedings already automatically stayed by operation of Supreme Court Rule 368(b), if his theory was correct.

Aleman was not entitled to seek review here or in the supreme court until the circuit court had actually denied his motion to dismiss and, therefore, the mandate of this court, if one was necessary, was not automatically stayed under Supreme Court Rule 368(b).

## C

■ Aleman nevertheless claims that the circuit court did not have jurisdiction to hold the evidentiary hearing on February 9, 1995, because the appellate mandate, which ultimately was filed, was not issued until March 15, 1995. As previously shown, issuance of the mandate of March 15, 1995, was an unnecessary act and cannot now be construed to have deprived the circuit court of jurisdiction. The cases cited by Aleman involved timely and proper appeals in which the appellate court's jurisdiction had attached. See *People v. Palmer*, 188 Ill. App. 3d 378, 381-82, 543 N.E.2d 1106 (1989); *People v. Elsholtz*, 136 Ill. App. 3d 209, 210-11, 483 N.E.2d 386 (1985); *People v. McBride*, 114 Ill. App. 3d 75, 79-81, 448 N.E.2d 551 (1983). Unlike these cases, the court in the instant case did not make a final ruling on a pretrial motion and, therefore, until Aleman's motion to dismiss the indictments had been ruled upon fully, the notice of appeal was improper.

Further, Aleman fully participated in the evidentiary proceedings on February 9, 1995, notwithstanding the absence of a putative returned mandate. Although he claims to have objected to the proceedings, nothing about want of mandate was mentioned until March 21, 1995, long after the hearings commenced. If the return of a mandate had been required, Aleman waived its absence by participating in the hearing without waiting for or demanding this formality. See *Whitcanock v. Nelson*, 81 Ill. App. 3d 186, 400 N.E.2d 998 (1980). There was no error.

The circuit court had jurisdiction to conduct the evidentiary hearing.

## II

Defendant next asserts that a blending of federal and state constitutional protections proscribes reprosecution for the same offense, urging this court to construe Illinois constitutional guarantees liberally in his favor.[1]

## A

■ Aleman posits that Illinois authorities clearly have broadened the base of constitutional protections afforded by the United States Constitution, relying upon *People v. McCauley*, 163 Ill. 2d 414, 645 N.E.2d 923 (1994), *People v. Turnage*, 162 Ill. 2d 299, 642 N.E.2d 1235 (1994), *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 604 N.E.2d 929 (1992), and *People v. DiGuida*, 152 Ill. 2d 104, 604 N.E.2d 336 (1992). The foregoing cases involve expansions by the Illinois Supreme Court of clauses of the Illinois Constitution other than article I, section 10, which provides:

> "No person shall be compelled in a criminal case to give evidence against himself nor be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, § 10.

In *People v. Levin*, 157 Ill. 2d 138, 160, 623 N.E.2d 317 (1993), our supreme court rejected the argument that the fifth amendment's double jeopardy clause was more restrictive than its Illinois counterpart. In *Levin*, the court noted that despite the difference in phraseology between the Illinois and federal double jeopardy provisions, "the difference in wording offers no substantial basis to support a conclusion that Illinois' clause provides broader protections than does its Federal counterpart." 157 Ill. 2d at 160.

Aleman nevertheless insists that Illinois provides protections beyond those assured by the fifth amendment, relying upon *People v. Van Cleve*, 89 Ill. 2d 298, 432 N.E.2d 837 (1982), and *People v. Pender*, 154 Ill. App. 3d 978, 507 N.E.2d 951 (1987). In *Pender*, the court dismissed the State's appeal following a directed verdict for defendant. 154 Ill. App. 3d at 982. Although *Pender* discussed double jeopardy, the court concluded that article VI, section 6, of the Illinois Constitution barred the State's appeal from an acquittal.[2] 154 Ill. App. 3d at 980. The *Pender* court cited *People v. Van Cleve*,

---

[1]Although the Reitinger murder was not at issue in the evidentiary hearing, Aleman has consistently treated the two indictments as related. Specifically, he filed a single motion to dismiss both indictments and has appealed both indictments under the same appellate number. We shall accord this aspect of the appeal the same treatment.

[2]Article VI, section 6, of the Illinois Constitution relates to the jurisdiction of appellate courts.

89 Ill. 2d 298, 432 N.E.2d 837 (1982), for the proposition that article VI, section 6, of the Illinois Constitution "provide[s] rights and protections beyond those assured by the double jeopardy clause." 154 Ill. App. 3d at 982. No Illinois case cited by Aleman concludes that article I, section 10, of the Illinois Constitution provides greater protection than the double jeopardy clause of the United States Constitution.[3] In fact, the most recent Illinois Supreme Court decisions are to the contrary. See *People v. Carrillo*, 164 Ill. 2d 144, 147-48, 646 N.E.2d 582 (1995); *People v. Levin*, 157 Ill. 2d 138, 160, 623 N.E.2d 317 (1993).

The Illinois double jeopardy provision affords no greater protection than the double jeopardy clause of the fifth amendment.

## B

■ Aleman persists in his theory that his acquittal in the 1977 murder trial is an absolute bar to any further reprosecution, based upon fifth amendment considerations.

The fifth amendment to the United States Constitution provides, in part, as follows:

> "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law ***." U.S. Const., amend. V.

No case has been cited by Aleman or the State involving the application of double jeopardy principles to circumstances presented here: the alleged bribery of a judge resulting in acquittal of a defendant whom the State seeks to retry for the same offense. Accordingly, we treat this issue as one of first impression.

The protections against double jeopardy afforded by the fifth amendment are applicable to the states through the due process clause of the fourteenth amendment. *Benton v. Maryland*, 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056 (1969). "[A] defendant once acquitted may not be subjected to trial without violating the Double Jeopardy Clause." *United States v. Scott*, 437 U.S. 82, 96, 57 L. Ed. 2d 65, 77, 98 S. Ct. 2187, 2196 (1978). Moreover, a public interest exists in the finality of criminal judgments and bars a reprosecution even

---

[3]Aleman argues in his reply brief that former jeopardy has broader analytical overtones based upon the wording of Supreme Court Rule 604(f) and section 3—4(a)(1) of the Criminal Code of 1961 (720 ILCS 5/3—4(a)(1) (West 1992)). Although Rule 604(f) states "former jeopardy" and the statute provides "former prosecution," case law has not bestowed upon Supreme Court Rule 604(f) any such special distinction. We also decline to do so.

when the acquittal is based upon an egregiously erroneous foundation. *United States v. DiFrancesco*, 449 U.S. 117, 129, 66 L. Ed. 2d 328, 341, 101 S. Ct. 426, 433 (1980), citing *Fong Foo v. United States*, 369 U.S. 141, 143, 7 L. Ed. 2d 629, 631, 82 S. Ct. 671, 672 (1962).

In *Green v. United States*, 355 U.S. 184, 187-88, 2 L. Ed. 2d 199, 204, 78 S. Ct. 221, 223 (1957), the United States Supreme Court, in discussing double jeopardy, stated:

> "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

Of particular importance here is that *"[j]eopardy denotes risk. In the constitutional sense, jeopardy describes the risk* that is traditionally associated with a criminal prosecution." (Emphasis added.) *Breed v. Jones*, 421 U.S. 519, 528, 44 L. Ed. 2d 346, 354, 95 S. Ct. 1779, 1785 (1975). The word "acquittal" invokes no talismanic protection; courts are dutybound to examine the substance of the claim. *Serfass v. United States*, 420 U.S. 377, 392, 43 L. Ed. 2d 265, 276, 95 S. Ct. 1055, 1064-65 (1975); *People v. Rudi*, 103 Ill. 2d 216, 223-24, 469 N.E.2d 580 (1984); *People v. Deems*, 81 Ill. 2d 384, 388, 410 N.E.2d 8 (1980); *People v. Edwards*, 97 Ill. App. 3d 407, 411-12, 422 N.E.2d 1117 (1981). A court may not apply rigid or mechanical rules in interpreting the double jeopardy clause. *Serfass*, 420 U.S. at 390, 43 L. Ed. 2d at 275, 95 S. Ct. at 1064, citing *Illinois v. Somerville*, 410 U.S. 458, 35 L. Ed. 2d 425, 93 S. Ct. 1066 (1973). See Annotation, *Earlier Prosecution for Offense During Which Homicide was Committed As a Bar to Prosecution for Homicide*, 11 A.L.R.3d 834 (1967).

Aleman's argument for dismissal of the instant indictments is based essentially upon double jeopardy's emphasis on finality, urging that "an acquittal is an acquittal," citing cases to establish this "absolute" constitutional hypothesis. Several cases do state broadly that a verdict of acquittal cannot be reviewed without putting a defendant twice in jeopardy; however, none of them involve any fraud on behalf of defendants or the lower courts. See generally *People v. Porter*, 156 Ill. 2d 218, 620 N.E.2d 381 (1993); *People v. Creek*, 94 Ill. 2d 526, 447 N.E.2d 330 (1983); *People v. Borchers*, 67 Ill. 2d 578, 367 N.E.2d 955 (1977); *People v. Brown*, 227 Ill. App. 3d 795, 592 N.E.2d 342 (1992). The same is true of *People ex rel. Daley v. Crilly*, 108 Ill. 2d 301, 483 N.E.2d 1236 (1985), and *People v. Wiley*, 71 Ill. App. 3d 641, 389 N.E.2d 1283 (1979), on which Aleman also relies.

Fairness and finality to *both* parties are integral components of double jeopardy. See generally *Lockhart v. Nelson*, 488 U.S. 33, 44-47, 102 L. Ed. 2d 265, 276-78, 109 S. Ct. 285, 293-94 (1988) (Marshall, J., dissenting, joined by Brennan and Blackman, JJ.); *Burks v. United States*, 437 U.S. 1, 15-16, 57 L. Ed. 2d 1, 12-13, 98 S. Ct. 2141, 2149-50 (1978); *United States v. DiFrancesco*, 449 U.S. 117, 129, 66 L. Ed. 2d 328, 340-41, 101 S. Ct. 426, 433 (1980). The State also must be provided with at least "one fair opportunity to offer whatever proof" it can assemble. See *Burks*, 437 U.S. at 16, 57 L. Ed. 2d at 12, 98 S. Ct. at 2149-50; *Edwards*, 97 Ill. App. 3d at 411-12.

The protections afforded by double jeopardy are not as absolute and conclusive as Aleman suggests; exceptions are recognized and applied when appropriate. Two such exceptions are relevant to the present case: first, a sham trial, which results in an acquittal because the State does not submit evidence, cannot be considered jeopardy. *People v. Deems*, 81 Ill. 2d 384, 410 N.E.2d 8 (1980). In *Deems*, the circuit court denied the State's motion to dismiss and held trial. The State presented no evidence at trial and even admitted that defendant did not commit the pending charge but sought to indict defendant for a different crime. 81 Ill. 2d at 387. Although the circuit court acquitted defendant, the *Deems* court held that jeopardy had not attached to defendant's case although the trial ended in an "acquittal," because the proceeding bore none of those characteristics except the label. 81 Ill. 2d at 389. The *Deems* court, therefore, found that the first "trial" was a sham because "defendant was at no time *** in danger of being found guilty of any offense." 81 Ill. 2d at 390; see *Lockett v. Montemango*, 784 F.2d 78 (2d Cir. 1986); *People v. Rudi*, 103 Ill. 2d 216, 469 N.E.2d 580 (1984); *People v. Verstat*, 112 Ill. App. 3d 90, 444 N.E.2d 1374 (1983); *People v. Edwards*, 97 Ill. App. 3d 407, 422 N.E.2d 1117 (1981).

The second relevant exception to the absolutism of double jeopardy is fraud or collusion. The circuit court's interim ruling in the case *sub judice* correctly noted that "a judgment of acquittal procured by a defendant through fraud is a nullity and does not put him in jeopardy."[4] That jeopardy cannot attach to proceedings infected with fraud or collusion is ineluctable. *Serfass v. United States*, 420 U.S. 377, 43 L. Ed. 2d 265, 95 S. Ct. 1055 (1975); *Lockett v. Montemango*, 784 F.2d 78 (2d Cir. 1986). The *Serfass* court noted, in relation to dismissal of a criminal prosecution prior to trial, that a defendant must

---

[4]The circuit court's interim ruling articulated extraordinary analysis and depth of case law and treatises which recognize that an acquittal procured by fraud does not act as a bar to a subsequent prosecution.

be " 'subjected to the hazards of trial and possible conviction.' " 420 U.S. at 391, 43 L. Ed. 2d at 276, 95 S. Ct. at 1064, quoting *Green v. United States*, 355 U.S. 184, 187, 2 L. Ed. 2d 199, 204, 78 S. Ct. 221, 223 (1957). Further, "the language of the cases in which we have held that there can be no appeal from, or further prosecution after, an 'acquittal' cannot be divorced from the procedural context in which the action so characterized was taken." 420 U.S. at 392, 43 L. Ed. 2d at 276, 95 S. Ct. at 1064. To the same effect is *Lockett*, in which the State was permitted to reprosecute defendant because he was not subject to jeopardy in the first proceeding by virtue of his fraudulent representations to the court. *Lockett*, 784 F.2d at 84.

Similarly, the common law supports the State's contention that a defendant who was acquitted due to fraud or collusion was never placed in jeopardy and, therefore, could be reprosecuted. Fraudulent actions by defendants have been recognized historically as exceptions to the constitutional protections afforded by double jeopardy principles.[5] See *State v. Brown*, 16 Conn. 54 (1843); *State v. Jones*, 7 Ga. 422 (1849); *State v. Bell*, 81 N.C. 551 (1879); *State v. Howell*, 220 S.C. 178, 66 S.E.2d 701 (1951); *State v. Johnson*, 248 S.C. 153, 149 S.E.2d 348 (1966). This principle has been applied in other contexts. *Goene v. State*, 577 So. 2d 1306 (Fla. 1991); *State v. Burton*, 314 So. 2d 136 (Fla. 1975); *State v. Nardone*, 114 R.I. 363, 334 A.2d 208 (1975); *Benard v. State*, 481 S.W.2d 427 (Tex. Crim. App. 1972).

Did Aleman's actions in the case *sub judice* rise to the level of fraud or collusion such that he was not subjected to "the risk that is traditionally associated with a criminal prosecution"? The answer must be in the affirmative, considering analogous circumstances. See *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 89 L. Ed. 2d 823, 106 S. Ct. 1580 (1986) (invalidating a judgment of the Alabama Supreme Court because a justice on that court was a party to a similar case pending in an Alabama trial court and, therefore, the judge's pecuniary interest in the outcome of the case required new proceedings); *Breed v. Jones*, 421 U.S. 519, 528, 44 L. Ed. 2d 346, 354-55, 95 S.

---

[5]The State correctly maintains that the fraud in the instant case is unlike perjury. A perjurer is subject to cross-examination and impeachment; fraud is far more pernicious because the outcome is predetermined, regardless of the evidence presented at trial. The State argues, further, that the bribe in the case *sub judice* renders the verdict void. *People v. Drysch*, 311 Ill. 342, 348-49, 143 N.E. 100 (1924). In *Drysch*, the supreme court noted that a court is authorized to vacate a judgment which has been obtained through fraud. 311 Ill. at 348-49.

Ct. 1779, 1785 (1975) (where pecuniary interests of judges have been involved in the cases, the results must be invalidated); *In re Murchinson*, 349 U.S. 133, 136, 99 L. Ed. 942, 946, 75 S. Ct. 623, 625 (1955) (recognizing that "[f]airness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome"); *Tumey v. Ohio*, 273 U.S. 510, 521-22, 71 L. Ed. 749, 754, 47 S. Ct. 437, 440-41 (1927) (holding that defendant was entitled to a new trial where the trial judge received $12 by statute for each case that resulted in a conviction because "officers acting in a judicial *** capacity are disqualified by their interest in the controversy to be decided").

The circuit court's supplemental ruling in the present case conclusively determined that there was sufficient evidence to prove the bribery of Judge Wilson and that Aleman had committed the substantive offense of bribery. Aleman contends that he "does not urge a crepuscular constitutional doctrine"; however, his insistence on the finality of acquittals begs this court to adopt an inhibited perception of justice. Given his involvement in the bribery of Judge Wilson in order to procure an acquittal in his 1977 murder trial, we conclude that Aleman clearly was not subject to the risk normally associated with a criminal prosecution. The principles of double jeopardy do not bar the instant reindictment and reprosecution.

By bribing the judge, Aleman prevented a fair "resolution" of the first proceeding. See generally *United States v. Scott*, 437 U.S. 82, 57 L. Ed. 2d 65, 98 S. Ct. 2187 (1978); *Simmons v. United States*, 142 U.S. 148, 35 L. Ed. 968, 12 S. Ct. 171 (1891); *People v. Ortiz*, 151 Ill. 2d 1, 600 N.E.2d 1153 (1992); *People v. Forbis*, 12 Ill. App. 3d 536, 298 N.E.2d 771 (1973); *In re Ascher*, 130 Mich. 540, 90 N.W. 418 (1902); *State v. Cutshall*, 278 N.C. 334, 180 S.E.2d 745 (1971).

Aleman would distinguish the foregoing cases upon the proposition that double jeopardy does not operate to prevent a second trial where a lower court discovers a corrupted process upon *immediate* inquiry. The cases recognize, however, that the substance of the proceeding, rather than the form, is the provenance of justice. The constitution demands fairness not only for the accused but also for the accuser. See *Snyder v. Massachusetts*, 291 U.S. 97, 122, 78 L. Ed. 674, 687, 54 S. Ct. 330, 338 (1934) (Cardozo, J., stating that "justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true"), *overruled on other grounds, Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964). It is ludi-

crous to suggest that Aleman has a vested right to a prejudiced fact finder; he will not be allowed to employ here the principles of double jeopardy to shield himself from a second prosecution. See *Simmons v. United States*, 142 U.S. 148, 35 L. Ed. 968, 12 S. Ct. 171 (1891).

## C

■ Aleman's assertion that the Reitinger indictment is barred under Illinois case law proscribing successive federal/state prosecutions, relying upon *People v. Carrillo*, 164 Ill. 2d 144, 147, 646 N.E.2d 582 (1995), and *People v. Porter*, 156 Ill. 2d 218, 620 N.E.2d 381 (1993), also is rejected. "[A] federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one. The basis for this doctrine is that prosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offence to be twice put in jeopardy.' " *United States v. Wheeler*, 435 U.S. 313, 317, 55 L. Ed. 2d 303, 308-09, 98 S. Ct. 1079, 1082-83 (1978); see *United States v. Pungitore*, 910 F.2d 1084, 1105 (3d Cir. 1990); *People v. Porter*, 156 Ill. 2d 218, 221-22, 620 N.E.2d 381 (1993).

Aleman was indicted in 1977 on two counts of racketeering, based upon two acts of robbery and one count of interstate transportation of stolen property. *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979). Following conviction, the federal government petitioned the court to sentence Aleman as a "special offender" pursuant to 18 U.S.C. § 3575 (1988), arguing that he participated in Reitinger's murder. The district court denied the government's petition and sentenced Aleman solely upon the charges presented. Therefore, Aleman was neither charged with, nor sentenced upon, Reitinger's murder during his 1977 RICO prosecution.

In 1990, Aleman and several others again were indicted for RICO violations. 18 U.S.C. §§ 1961 through 1962(d) (1988). This time he participated in a pattern of racketeering activity based upon 26 acts, one of which was Reitinger's murder. Although he entered a guilty plea, he denied, in part:

> "that he participated in any way in the murder of Anthony Reitinger and further denies that he participated in any bribe of Judge Frank Wilson. The government and his attorney agree that the outcome of a trial or sentencing hearing as to the crimes described in this paragraph is uncertain."

The record reveals, then, that although one of the predicate acts of the 1990 RICO prosecution was the extortion and murder of Reitinger, Aleman's plea agreement specifically denied any involvement in that crime. The United States Attorney advised the district court that the plea agreement "is perhaps a bit unusual in the sense

that, as charged in the indictment, Mr. Aleman has been named in participating in two extortions and murder. The plea contemplates an agreement between all the parties in essence that the murder aspect of the indictment will not be resolved." The record uncontrovertably demonstrates that his plea agreement specifically denied any involvement in the Reitinger murder. Neither *People v. Carrillo*, 164 Ill. 2d 144, 646 N.E.2d 582 (1995), nor *People v. Porter*, 156 Ill. 2d 218, 620 N.E.2d 381 (1993), supports his argument, therefore, because the 1990 RICO pleading in the instant case did not involve any factual finding that he participated in the Reitinger murder.

The 1977 and 1990 RICO prosecutions of Aleman do not impede the State's current indictment of him for the murder of Anthony Reitinger.

The foregoing discussion reveals no bases upon which to disturb the circuit court's refusal to dismiss the instant indictments. Accordingly, the court's ruling must be affirmed.

Affirmed.

SCARIANO and BURKE, JJ., concur.