UNITED STATES of America,

v.

Rodney MORRISON, Defendant.

No. 04–CR–699 (DRH).

United States District Court,
E.D. New York.

Nov. 6, 2013.

Loretta Lynch, United States Attorney by Nicole Boeckmann, A.U.S.A., James M. Miskiewicz, A.U.S.A., Central Islip, NY, for the Government.

Murphy Falcon Murphy Ravenell Koch by William H. Murphy, Jr., Esq., Kenneth W. Ravenell, Esq., Baltimore, MD, Levitt & Kaizer by Richard Levitt, Esq., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

HURLEY, Senior District Judge.

### Defendant's Application for a new Trial

By notice of motion dated February 8, 2013 and returnable on April 26, 2013, Rodney Morrison ("Morrison" or "defendant") moved to vacate his May, 2008 conviction for RICO conspiracy ("Count Two") and unlawful possession of a firearm as a convicted felon ("Count Eight").

For the reasons provided *infra*, that application is granted and a new trial as to those two counts will be scheduled in due course.

### Events Leading to, and Nature of Defendant's Application

In seeking the above relief, defendant relies on information furnished by the government in December of 2012 concerning possible jury tampering. As part of that notification, defendant was furnished with post-verdict law enforcement interview notes for Keith Anstead ("Anstead"), the jury foreperson, and of Michelle Carratu ("Carratu"), an alternate juror who was never called upon to deliberate. Based on a perusal of those interview notes, defendant opines that:

* Anstead was the object of a bribe offer;

* Anstead agreed to accept the offer— a felony;

* Anstead and Carratu failed to advise the Court of the bribe offer—a violation of their oaths as jurors;

* Anstead and Carratu repeatedly lied to investigators—each such lie being a felony;

* Anstead told other jurors, including jurors Bernard Finn and Wendy Morgan, of the bribe offer—infecting these jurors as well;

* Anstead and three other jurors, Finn, "Bill" and "Jason," visited the

Reservation during the trial—without the Court's knowledge or permission.

(Def.'s Feb. 8, 2013 Mem. in Supp. at 12.)

Given that litany of apparent wrongdoing, Morrison argued that "[t]he case law establishes that circumstances far less severe than these require a finding of 'implied juror bias,' i.e. a presumption of prejudice that is irrefutable and which therefore cannot be rebutted at a hearing. Accordingly, Mr. Morrison's convictions should be vacated." (*Id.*)

The Court did not adopt defendant's position that he was entitled to a new trial absent a hearing. Considering the nature, breadth and seeming egregiousness of the tampering information provided by the government, I wanted to hear firsthand what transpired rather than having the information filtered through third parties. Accordingly, a hearing was held on three dates, viz. April 26, 2013, May 14, 2013 and June 3, 2013, during which the government arranged for Anstead and Carratu to testify and, at my direction, also produced jurors Bernard Finn ("Finn") and Wendy Morgan ("Morgan") for examination.

*Synopsis of Hearing Testimony*

1. *Anstead*

Anstead testified that he was car pooling with alternate juror Carratu to and from court during the trial. On a "Thursday," "during deliberations," (Tr. at 17), he found a cell phone "a couple of feet" from the passenger side of her automobile in the courthouse parking lot. (*Id.* at 19.) "We took it into the car with us" and started home. (*Id.*) He "went through it to see if it [belonged] to anybody . . . on the jury." (*Id.* at 20.) In doing so, he saw the surname Morrison apparently in the contact list more than once, although he doesn't recall any corresponding first names. (*Id.* at 20–21.) He also observed a video on the phone of a partially unclothed woman interacting with a male he believed was "Morrison's son." (*Id.* at 23.)

While Anstead and Carratu were traveling on the Southern State Parkway, the cell phone rang. After Anstead answered it and said "hello," the person making the call extended a "monetary offer" which, Anstead reports, "threw [him] for a loop" and caused him to become "very nervous." (Tr. at 28.) "To the best of [his] recollection" the caller "made an offer to [him] . . . to sway the jury." (*Id.* at 29.) The amount offered, which began in the "10 to 15 thousand" dollar range, eventually reached "$20,000." (*Id.* at 33.) Although Anstead denied ever agreeing with the caller to accept a bribe or, at least, so indicating to law enforcement, he later acknowledged—when pressed by defense counsel—that he had, in fact, signed a statement for the FBI to that effect. (*Id.* at 36–37.)

Anstead later testified that when the issue of a bribe was first broached he "didn't take it seriously" and thought it was "a joke." (Tr. at 47.) But as the conversation progressed, i.e. "g[o]t serious," Anstead's level of anxiety increased. (*Id.* at 48; *see also id.* at 252.) And aggravating his mental state was his belief that the caller knew where he lived. (*Id.* at 57–58.)

Anstead testified that when court reconvened on the Monday morning following the finding of the phone, Carratu gave it to a court officer, apparently simply saying that she had found it and nothing else. (Tr. at 64.)

Although Anstead knew that he should have reported the bribe offer to me directly or through the courtroom deputy, he elected not to do so. (*Id.* at 66–67.) In fact, he and Carratu discussed the matter and he decided it was best "not to mention

the phone." (*Id.* at 71–72.) As he explained: "[N]o matter what he was saying to me on the phone, there was no way that he was going to influence me in my decision on the jury.[1] And it was late in the jury and I wanted to finish it out." (*Id.* at 67.)

Although the Court was not advised of the situation, Anstead did tell jurors Finn and Morgan about finding the phone, (Tr. at 73), and of his belief that it belonged to "Mr. Morrison's son." (*Id.* at 74.) When asked if he told Finn "about the bribe offer," included within his convoluted response was the comment: "I'm not a 100 percent sure of that." (*Id.*) He didn't recall if he told Morgan about the bribe offer. (*Id.* at 81.)

During cross examination by Assistant United States Attorney Nicole Boeckmann ("Boeckmann"), Anstead indicated that the Thursday the phone was found was April 3, 2008 and the date of the phone's delivery to courthouse security the following Monday was April 7, 2008. (Tr. at 201–02.) Jury deliberations began on April 1, 2008. (*Id.* at 212.) When asked if he ever took a bribe "in connection with this case," he answered in the negative. (*Id.* at 265.) He reiterated on cross examination that he did discuss the finding of the phone with Finn and Morgan, (*id.* at 272), and replied that he "might have" discussed the bribe offer with Finn (*id.* at 273), and that he "believe[d] that [he] told [Morgan] about the bribe offer on the phone" and that he believed the caller was "Rodney Morrison, Jr." (*Id.* at 274–75.)

On redirect, Anstead indicated that he did not tell Carratu that "prior to the cell phone incident that [he] and three other jurors had visited the Indian reservation." (Tr. at 306.) He also admitted that Carratu had alerted him that the federal agents who had interviewed her were on their way to discuss the jury tampering episode with him, even though he told the agents upon their arrival that he had no advance warning from Carratu. (*Id.* at 91.) The purpose of the contact between Carratu and Anstead, Anstead believed, was to increase the likelihood that they would be "on the same page" during their respective interviews. (*Id.*)

### 2. *Carratu*

Carratu testified that when she found the phone she wanted to take it immediately to "security" but Anstead suggested that they return it on Monday instead. (Tr. at 140.) Anstead told her that "Rodney family members [were listed on the phone] contacts." (*Id.* at 141.) She testified that after they were on the Southern State Parkway for about fifteen minutes returning to their residences from the courthouse, the phone rang. When asked who she understood was calling, she indicated "[o]ne of [the defendant's] family members, I don't remember who."[2] (*Id.* at 145.) She knew that because Anstead pointed to the screen on the phone. When the phone rang Anstead answered it, not by saying hello as he testified, but rather by saying "what." (*Id.* at 147.) She heard Anstead say "how much." (*Id.*) She also confirmed as accurate her earlier state-

---

**1.** The first sentence of Anstead's explanation is problematic because (1) as later explained in the text, in determining whether the bribe offer was harmless, the appropriate reference point is a typical juror rather than the particular juror subject to the extraneous influence, and (2) under Federal Rule of Evidence 606(b) a juror receiving extraneous informa-

tion may not testify about the impact of that information on his or her thought process or the jury's deliberations. *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.1994).

**2.** The phone was not on "speaker." (Tr. at 146.) Thus, Carratu only heard one side of the conversation.

ment to an FBI agent that Anstead said "this is what I want" referring to the sum of $20,000. (*Id.* at 150.)

As to the issue of whether any jurors went to the Peace Pipe during the trial, she testified that Finn told her that he, Finn, "Bill," [and], "Jason" made such a visit. (*Id.* at 164–66.)

Carratu didn't tell the Court about the bribe offer or the conversation she had with Anstead about visiting the Peace Pipe because she "didn't want to be [perceived] as ratting [her] friends out." (Tr. at 168.) Concluding her direct testimony, she confirmed that she "told the agents that [she] believed that Anstead had agreed to throw the case during the conversation that he had on the phone." (*Id.* at 172.)

On redirect by defense counsel, Carratu acknowledged that she alerted Anstead after the agents left her home that they were coming to question him, even though she was asked not to do so. (*Id.* at 348.)

### 3. *Finn*

Finn was called to the stand on June 3, 2012. He testified that, to the best of his recollection, the cell phone was found before deliberations. (Tr. at 387.) In any event, he "remember[ed] Keith saying that he found the cell phone .... he was showing it to me, talking about it. I wasn't really interested in it, didn't know anything about it, didn't care." (*Id.* at 388.) At the time "[t]here were four [of us] in [Anstead's] car," viz. Anstead, the witness, "Deborah and [Carratu]." (*Id.* at 389.) During the trip, Anstead "tried to show [him] the video but [he] wasn't really paying attention." (*Id.* at 405.) Anstead identified the male in the video as "[s]omebody, you know, in the Morrison camp." (*Id.* at 406.) Anstead never told Finn, according to Finn, "that he received a call on [the] phone." (*Id.* at 411.)

During examination by Boeckmann, Finn was told that Anstead and Carratu had said that they found the phone on a Thursday, that the Court was not in session on Friday and that the phone was turned-in first thing on Monday morning. (Tr. at 440.) Notwithstanding that testimony, Finn indicated that Anstead had the phone for a few days and during that time he discussed the phone with Anstead. (*Id.* at 440–41.)

### 4. *Morgan*

She recalled that Anstead, Finn and possibly Carratu talked about going to the Peace Pipe, but she never heard whether, in fact, they did so. Morgan testified that Anstead never told her that he found a phone in the parking lot or that he was offered a bribe. (Tr. at 458–59.)

### *DISCUSSION*

### 1. *Overview of Defendant's Legal Argument*

By way of an overview of defendant's position in seeking a new trial, he argues:

> Juror Keith Anstead deliberated as foreperson on Rodney Morrison's jury even though he was offered—and likely agreed to accept—a bribe and violated his oath by failing to report these events to the Court. Because he did so, Morrison is entitled to a new trial (1) under *Remmer v. United States,* 350 U.S. 377[, 76 S.Ct. 425, 100 L.Ed. 435] (1956) (*Remmer II*), because the government has failed to rebut the presumption of prejudice that inures from these facts, and (2) under *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548[, 104 S.Ct. 845, 78 L.Ed.2d 663] (1984) because, had the Court been aware of these facts during trial, it un-

questionably would have removed Anstead from the jury.

(Def.'s Post Hr'g Mem. in Supp. at 1.)

2. *Holdings in Remmer I, Remmer II, and McDonough Power Equipment, Inc. v. Greenwood, Coupled With Comments Regarding Their Relevance for Present Purposes*

a) *Remmer I and Remmer II*

The case of Elmer F. Remmer ("Remmer") reached the Supreme Court on several occasions following his conviction for wilfully attempting to evade and defeat federal income taxes. After the jury had returned its guilty verdict, Remmer "learned for the first time that during the trial a person unnamed had communicated with a certain juror [viz. "Smith"], who afterwards became the jury foreman, and remarked to him that he could profit by bringing in a verdict favorable to [Remmer]." *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 450–51, 98 L.Ed. 654 (1954) (*"Remmer I "*).

Juror Smith immediately reported the incident to the trial judge who, in turn, advised the prosecutor. The FBI was then requested to make an investigation and file a report. As part of that investigation, an FBI agent interviewed Smith during the trial. Once the investigation was completed and the results provided to the judge and the prosecutor, they concluded that the statement to the juror was made in jest and that nothing further was required to be done. Unfortunately, none of the above information was shared with Remmer or his counsel.

Upon learning post-trial what had occurred, Remmer, unsuccessfully, sought a new trial from the district court. The denial of the relief requested was affirmed by the Ninth Circuit. However, the Supreme Court "vacate[d] the judgment of the Court of Appeals and remand[ed] the

case to the District Court with directions to hold a hearing to determine whether the incident complained of was harmful to the petitioner, and if after hearing it is found to have been harmful, to grant a new trial." *Remmer,* 74 S.Ct. at 451–52. The required hearing was held, at the conclusion of which the district court concluded that the incident was not harmful to Remmer. That determination was again affirmed by the Court of Appeals with the Supreme Court again granting certiorari, this time "limited to the question of the effect of the extraneous communications with the juror upon [Remmer's] right to a fair trial." *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 426, 100 L.Ed. 435 (1956) (*"Remmer II "*).

The Supreme Court in *Remmer II* began its discussion of the applicable law by reiterating what it had said in *Remmer I,* to wit

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court with full knowledge of the parties.

*Id.* at 426–427 (internal quotation marks and citations deleted). That was followed by a recitation of the relevant facts which are as follows. Juror Smith had been visited at his home approximately three weeks after the Remmer trial started by an insurance agent named Satterly. Satterly said to Smith "I know Bones Remmer very well. He sold Cal–Neva for $850,000 and really got about $300,000 under the table.... Why don't you make a deal with him?" (*Id.* at 427.) Smith immediately "reminded Satterly that he was on the jury and that he could not talk about the case," thereby concluding his

interaction with Satterly concerning the matter. (*Id.*)

█ Smith testified at the hearing following the initial remand that he was disturbed by Satterly's comments. The juror also testified that the FBI agent who interviewed him during the trial about the comments explained that he was there to "see whether there was anything to this or not." (*Id.*) The FBI report was not divulged to Smith until after the trial was over. Based on the above scenario, the Court concluded

> We think this evidence, covering the total picture, reveals such a state of facts that neither Mr. Smith nor anyone else could say that he was not affected in his freedom of action as a juror. From Smith's testimony it is quite evident that he was a disturbed and troubled man from the date of the Satterly contact until after the trial. Proper concern for protecting and preserving the integrity of our jury system dictates against our speculating that the F.B.I. agent's interview with Smith, whatever the Government may have understood its purpose to be, dispersed the cloud created by Satterly's communication. As he sat on the jury for the remainder of the long trial and as he cast his ballot, Smith was never aware of the Government's interpretation of the events to which he, however unwillingly, had become a party. He had been subjected to extraneous influences to which no juror should be subjected, for it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made.... We hold that on a consideration of all the evidence ... [Remmer] is entitled to a new trial.

*Remmer v. United States,* 76 S.Ct. at 427–28. "In short, *Remmer II* is an application of the implied bias doctrine." *Brooks v.* *Dretke,* 444 F.3d 328, 331–32 (5th Cir. 2006). And, "implied bias ... is bias presumed as a matter of law." *United States v. Greer,* 285 F.3d 158, 171 (2d Cir.2002).

*Remmer II* is important for present purposes not only for its instruction that "any private communication, contact, or tampering directly or indirectly" with a sitting juror is "presumptively prejudicial" but also because of the Court's concomitant concern about the likely effect that Satterly's comment and the FBI investigation had on Smith's "freedom of action as a juror." Justice Minton, writing for the Court, did not say that they necessarily had an effect; instead the Court said that neither the juror nor "anyone else" could say that it did not somehow impair the juror's ability to perform his critical role. The primary focus in this portion of the opinion appears to be Satterly's comment which caused Smith to be "a disturbed and troubled man from [that] date ... until after the trial." (*Id.* at 427–28.) And, in the Court's view, there was no reason to believe that the resulting "cloud" was "dispersed" by the FBI's subsequent involvement. Indeed, the Court seems to be saying that the FBI investigation may have compounded the juror's troubled mental state due to the uncertainty attributable to the question of whether he, Smith, might somehow be faulted by the government based on his interaction with Satterly as unlikely as that possibility might have been.

Also noteworthy in *Remmer II* is the fact that the Court did not even consider in directing that Remmer receive a new trial the strength of the government's case or whether the bribe offer may have altered the outcome of the trial. That such considerations were not even factored into the analysis reflects the marked distinction

between the more "prosaic kinds of jury misconduct," *United States v. Dutkel*, 192 F.3d 893, 895 (9th Cir.1999),[3] and the "much more serious intrusion" into the jury's processes attributable to a bribe. *United States v. Henley*, 238 F.3d 1111, 1116 (9th Cir.2001). As a result, the strength of the government's case on the two counts of conviction—which, in my judgment was overwhelming [4]—is of marginal relevance at best. That the bribe offer was directed to Anstead alone and, I suspect, ultimately rejected—while relevant considerations—are, as discussed *infra*, not enough to preserve the guilty verdicts. *See Remmer II*, 350 U.S. 377, 76 S.Ct. 425 (1956) (Juror Smith rejected Satterly's suggestion that he endeavor to solicit a bribe) and *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir.2002) ("if even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury," *citing Parker v. Gladden*, 385 U.S. 363, 366, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966)).

Besides *Remmer I* and *Remmer II*, defendant references one other decision in the previously quoted introductory, or overview paragraph of his post-hearing Memorandum in Support, that being *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

### b) *McDonough Power Equipment, Inc. v. Greenwood*

In *McDonough*, Greenwood brought a product liability suit against McDonough for injuries he sustained while operating a lawn mower manufactured by them. Following the return of a defendant's verdict, Greenwood discovered that one of the jurors had failed to respond affirmatively as he should have to a question on voir dire concerning whether he or any member of his family had sustained "any severe injury .... whether it was an accident at home, or on a farm or at work that resulted in any disability or prolonged pain and suffering." *McDonough*, 464 U.S. at 550, 104 S.Ct. 845. Based on that failure, Greenwood sought a new trial alleging that the juror's silence had prejudiced his right to exercise peremptory challenges. On appeal from the district court's denial of his application, the Circuit adopted Greenwood's position and ordered a retrial.

The Supreme Court reversed, holding that before Greenwood would be entitled to a new trial, he had to establish that the juror's failure to answer honestly was material and that "a correct response would have provided a valid basis for a challenge for cause." (*Id.* at 556, 104 S.Ct. 845.)

Morrison maintains, relying on *McDonough*, that had Anstead informed the Court of the bribery attempt, his reaction to that attempt, as well as his interaction with the other jurors thereafter, I would

---

**3.** The Ninth Circuit provided the following case examples of more prosaic kinds of jury misconduct: " '*United States v. Olano*, 507 U.S. 725, 729–30, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (presence of alternate jurors during jury deliberations); *Rushen v. Spain*, 464 U.S. 114, 116, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (juror's recollection of unrelated crime committed by defendant's associate); *Smith v. Phillips*, 455 U.S. 209, 212, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (juror's application for investigative position at District Attorney's Office during trial); *United States v. English*, 92 F.3d 909, 913–14 (9th Cir.1996) (elevator encounter between juror and victims); *United States v. Maree*, 934 F.2d 196, 202 (9th Cir.1991) (juror's contact with friends who encouraged her to convict defendant); *United States v. Madrid*, 842 F.2d 1090, 1092 (9th Cir.1988) (court clerk consoled juror after another juror swore at her)." 192 F.3d at 895.

**4.** *See* discussion in text, *infra* at pp. 136–37.

have questioned him, together with other possible infected jurors, to determine if his, or their service should be terminated for cause.

The application of *McDonough* here gives rise to two questions: "(1) did Anstead knowingly violate his oath by not reporting the bribe offer and his resulting fear? And (2) if the Court had known of these circumstances during trial, would it have discharged Anstead and replaced him with an alternate juror? The answer to both of these questions is[, Morrison posits,] indisputedly, yes." (Def.'s Post–Verdict Mem. in Supp. at 18.)

### 3. *Burden of Proof, and What the Party With the Burden had to Prove*

■ As earlier noted both *Remmer I* and *Remmer II* indicated that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons deemed presumptively prejudicial. . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant." *Remmer I*, 74 S.Ct. at 451 and *Remmer II*, 350 U.S. 377, 76 S.Ct. 425, 426.

The government recognizes that an argument conceivably could be made that the *Remmer* burden of proof standard is no longer operative. (*See* Gov't's Mar. 18, 2013 Letter in Opp'n at pp. 2–5). Nonetheless, given that "this case is so factually similar to *Remmer*," the government has elected to accept "that it must bear a heavy burden to prove that the apparently unsuccessful effort to bribe a member of the jury was harmless." *Id.* at 5. The government proffers that *United States v. Dutkel*, 192 F.3d 893 (9th Cir.1999) provides guidance as to the appropriate *Rem-*

*mer* inquiry in a case such as the one at bar. In that regard, *Dutkel* instructs that the government's efforts to meet its burden should focus on "whether there is a reasonable possibility that the jury's deliberations" were influenced by the improper contact. *Dutkel*, 192 F.3d at 899. "In order to grant relief, the court need not conclude that the verdict . . . would have been different but for the jury tampering, but rather that the course of deliberations was materially affected by the intrusion. In making this determination, the court may not inquire into any juror's mental processes, but rather must focus on conduct." *Id.* (citing *United States v. Cheek*, 94 F.3d 136, 143–44 (4th Cir.1996) which, in turn, cited Fed.R.Evid. 606(b)).

■ The government agrees that Morrison has presented sufficient evidence to give rise to the *Remmer* rebuttable presumption, thereby triggering its obligation to come forward with information that the extraneous influence was harmless, i.e. did not materially affect the jury's deliberations. In gauging the prosecution's success in proving the negative, "the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror" *United States v. Greer*, 285 F.3d 158, 173 (2d Cir.2002) (quoting *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.1994). "[U]nless the district court is convinced that there is no reasonable possibility that the deliberations . . . were affected by the tampering, the court must vacate . . . [the] conviction[s]." *Dutkel*, 192 F.3d at 899. In the final analysis, the Court's job is to focus on the nature of the bribe offer and related incidents and decide whether the government has shown that the extraneous influence did not interfere with one or more of the juror's "freedom of action as a juror." *Remmer v. United States*, 76 S.Ct. at 427.

4. *Effect of Federal Rule of Evidence 606(b) Upon Defendant's Application for a new Trial*

■ *Remmer I* and *Remmer II* were decided prior to Federal Rule of Evidence 606(b) becoming law. *United States v. Williams–Davis,* 90 F.3d 490, 496 (D.C.Cir.1996). Its enactment complicates the government's task in meeting its burden. Under 606(b), "[d]uring an inquiry into the validity of a verdict ..., a juror may not testify about ... the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict...." Rule 606(b)(1). However, "a juror may testify about whether ... [an outside influence] was improperly brought to the jury's attention or "an outside influence [that] was improperly brought to bear on any juror." *Id.* Rule 606(b)(2). Accordingly, any line of inquiry is off-limits which seeks to elicit the effect, if any, the bribe offer had on the deliberative process generally or upon Anstead's specific determinations, or that of any other juror regarding the charges in the indictment. *See Bibbins v. Dalsheim,* 21 F.3d 13, 16–17 (2d Cir.1994).

5. *Defendant is Entitled to a new Trial Pursuant to the Doctrine of Implied Bias Based on the Totality of the Circumstances, Including the Evidence Adduced During the Hearing*

a) *Comparison of Facts at bar With Those in Remmer II*

■ The facts in *Remmer II* are sufficiently similar to the facts here to warrant the same conclusion being reached. As in *Remmer II* (following remand and the holding of an evidentiary hearing [5]), the "state of facts [reveals] that neither [Anstead] nor anyone else could say that he was not affected in his freedom of action as a juror." *Remmer II,* 76 S.Ct. at 427.

Anstead's mental state following the bribe offer has already been detailed. Anstead also testified that he was aware of his obligation to tell me immediately of the bribe offer but failed to do so because he wanted to "finish ... out" his jury service. Tr. at 67. Surely he recognized that his willful failure to abide by his oath exposed him to some type of significant sanction should his abhorrent conduct later be uncovered. Moreover, his stated reason for remaining silent raises at the very least grave concerns as to fitness as a juror. *Cf. United States v. Colombo,* 869 F.2d 149 (2d Cir.1989) (if a juror failed to reveal during voir dire that her brother-in-law was a government attorney because she wanted to sit on the case, defendants's conviction cannot stand).

Anstead's testimony was riddled with significant inconsistencies apparently attributable to both (1) the number of years separating his jury service and subsequent governmental investigation, and (2) his torturous efforts to extricate himself from a predicament of his own making, viz. sharing at least the finding of the phone, linked in his mind to someone in the Morrison camp, with several other jurors, but neglecting to advise the Court of this external intrusion into the jury's factfinding role. However, there is no question that a bribe offer was extended by someone to him as the jury foreperson, and I accept as accurate that the offer, and what tran-

---

**5.** "Following remand [as ordered in *Remmer I*] and [the holding of] an evidentiary hearing," the Supreme Court, *"now with full understanding of the incident,"* invoked the doctrine of implied bias in vacating the judgment of conviction and ordering a new trial.

*Brooks v. Dretke,* 444 F.3d 328, 331 (5th Cir. 2006) (emphasis added). Similarly the Court here garnered an "understanding of the incident" based on the hearing held in the Spring of this year.

spired thereafter, caused him to be, like Juror Smith in *Remmer II*, "a disturbed and troubled man from the date of the ... contact until after the trial," thereby impermissibly infringing on his right and, indeed, obligation, to decide the case on its merits, free "from unauthorized intrusions purposely made."[6] *Remmer II*, 76 S.Ct. at 427–28. Under such circumstances, harm to the defendant necessarily follows for "bias [is] presumed as a matter of law" in instances of implied bias. *See United States v. Greer*, 285 F.3d 158, 171 (2d Cir.2002); *see also Remmer II* (in which a new trial was ordered based on the likely affect on Juror Smith's mental state caused by Satterly's comment and the resulting FBI investigation, absent any separate analysis regarding actual harm to Remmer; such harm, in effect, was conclusively presumed); *Brooks v. Dretke*, 444 F.3d 328, 332 ("*Remmer II* is an application of the implied bias doctrine.").

b) *Likely Effect of Present Scenario on the Typical or Hypothetical Juror*

Of course, the Court's primary focus should not be on Anstead specifically. The appropriate inquiry is the likely effect of the scenario just recited upon a typical or hypothetical juror. Such a typical or hypothetical juror would find himself troubled by a bribe offer extended by someone whom he believed to be affiliated with Morrison. That belief, in and of itself, would tend to compromise a hypothetical juror's ability to function as a fair and impartial juror. *See United States v. Dutkel*, 192 F.3d 893, 897 (9th Cir.1999)

("Where the intrusion is (or is suspected to be) on behalf of the defendant raising the claim of prejudice, the presumption arises automatically because jurors will no doubt resent a defendant they believe has made an improper approach to them.")

The hypothetical juror would be further burdened during the deliberative process by (1) the nervousness and fear generated by the bribe offer, aggravated by his belief that the person offering the bribe knew where he lived, and (2) the spectre of dire consequences should his decision not to advise the Court of the bribe offer be later discovered as, of course, ultimately proved to be the case. *See United States v. Rosenthal*, 454 F.3d 943, 950 (9th Cir.2006).

■ Parenthetically, had I been advised of the bribe offer, it would have been my obligation to "investigate the matter to determine whether the juror's ability to perform [his] duty impartially ha[d] been adversely affected." *See United States v. Aiello*, 771 F.2d 621, 629 (2d Cir.1985). Knowing what I know now and should have known then, Anstead and Carratu, possibly others, would have been excused from continued service for implied (or "presumed") bias or for "inferable bias." *See generally, United States v. Torres*, 128 F.3d 38, 45–47 (2d Cir.1997). Thus, the very composition of the jury that decided Morrison's fate would have been different had Anstead and Carratu not violated their oath as jurors.

■ In sum, Morrison, like Remmer was guaranteed a fair trial. "One touchstone of a fair trial is an impartial trier of

---

**6.** Incidentally, I also believe, based primarily on Anstead's testimony, that he probably told Finn, and possibly Morgan about the bribe offer from someone in the "Morrison camp." Finn's and Morgan's testimony to the contrary I ascribe to understandable memory lapses given the five years that have elapsed since the jury returned its verdict.

With respect to possible juror trips to the Peace Pipe during the trial, the likelihood of that having occurred rests solely on the equivocal testimony of Carratu on the subject, which testimony falls far short of being convincing.

fact a jury capable and willing to decide the case solely on the evidence before it.' " *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). That right was violated here as a matter of law for the reasons indicated, thus necessitating a new trial.

### c) *Arguments Advanced by Government in its Effort to Prove the Negative, i.e. That the Freedom of Action of one or More Jurors was not Effected by the Bribe Offer*

In urging that it has rebutted the *Remmer* presumption of harm to the defendant, the government has presented several arguments, one of which emphasizes that Anstead, unlike Juror Smith in *Remmer II,* was not the subject of a governmental investigation during his jury service. However, both Smith and Anstead faced the prospect of negative repercussions based on the intrusive actions of a third party. Although Smith's concerns presumably were more immediately crystalized in that the FBI investigation was underway during the trial, that temporal consideration is more than counterbalanced by the way those two jurors responded to the external intrusions. Smith immediately rejected Satterly's suggestion and reported it promptly to the Court, thereby complying with his obligation as a juror. Anstead, on the other hand, intentionally did exactly the opposite. As a result, the level of anxiety experienced by Anstead—or more appropriately for pres-

ent purposes, a hypothetical juror—is at least comparable to that of Smith.

The government also, in an effort to show that a bribe offer and subsequent events were harmless, notes that the jury deliberated for an extended period after the case was placed in their hands and, ultimately, reached a split verdict. While those facts, viewed in isolation, may suggest that the bribe offer did not affect the jury deliberations, that proposition applied here is problematic.

The government's evidence as to the two counts of conviction was overwhelming. With respect to the racketeering conspiracy of which the defendant stands convicted under Count Two, the proven underlining racketeering acts consisted solely of trafficking in contraband cigarettes in violation of Title 18 United States Code Sections 2342(a) and 2. Given that such sales constituted the business of Morrison's publicly advertised Peace Pipe operation, there could be little, if any legitimate dispute that he "knowingly" engaged in those activities. 18 U.S.C. § 2342(a). As to his conviction under Count Eight for illegally possessing a firearm, the government had a tape recording of a conversation between Morrison and another individual which clearly evidenced Morrison's constructive control over the firearm.[7] While the government's proof as to Counts of acquittal pertaining to purported incidents of arson, murder and robbery was formidable, it, obviously, is not my role to second guess the jury's verdict.[8] However, with respect

---

7. The defendant was acquitted of Count Nine which similarly charged illegal possession of a firearm. While that acquittal is difficult to understand given the government's evidence, perhaps the jury compromised in reaching its verdict as to Counts Eight and Nine.

8. Parenthetically, the prosecutor endeavored during the hearing to elicit testimony from Carratu that one of the reasons she believed

"Finn took a bribe," Tr. at 315, was that she was shocked by the verdict in view of the convincing character of the government's evidence. *Id.* at 315–16. This testimony, if given, would have dovetailed with what she told the FBI in a statement she provided on October 23, 2012. In any event, that line of inquiry was not pursued following defense counsel's objection—erroneously taken, as it develops—that the witness did not previously

to the matter presently under discussion, prolonged deliberations on two counts where factually any other verdict would virtually defy logic, while acquitting the defendant of multiple counts where the proof, although less compelling was still substantial, provides scant support for the proposition that Anstead's, and possibly other juror's, freedom of action during deliberations was not impaired via the bribe offer. In fact, it is at least equally probable that the converse is true.

In addition to the foregoing arguments, the government proffers that certain cases are instructive. Within that category, is *United States v. Greer*, 285 F.3d 158 (2d Cir.2000), which the government describes as "a case almost identical to the one before this court." (Gov't's July 1, 2013 Letter in Opp'n at 7.) Greer was convicted of several crimes including conspiracy to import and export hashish and marijuana. John Baker ("Baker") served on the jury. Following Greer's conviction, several allegations of wrongdoing by Baker surfaced. The most relevant for present purposes is that Baker, prior to the jury selection process being commenced,

> had been contacted by an old acquaintance who knew that Baker might serve as a juror for Greer's prosecution. The acquaintance said that Greer had not sent him, but that he was a "close friend" of Greer and wanted to make sure that there would be a "sympathetic ear" on the jury. Baker interpreted this contact as a bribe attempt. He responded that the contact was "inappropriate" and the offer "illegal." He then told the individual that he "ought [to] kick his

ass for even suggesting [a bribe] if that's what he was suggesting."
*Greer*, 285 F.3d at 166.

In rejecting Greer's argument that Baker's failure to disclose the subject comment invalidated the verdict, the Circuit held that the district court did not abuse its discretion in concluding that, had Baker answered the question correctly, his answer would not have provided a valid basis for him being excused for cause, citing *McDonough*, 464 U.S. at 556, 104 S.Ct. 845. *Id.* at 170.

*Greer*, while certainly relevant, is distinguishable from the case at bar for multiple reasons including (1) the comment in *Greer* which Baker construed as a bribe offer was conveyed prior to jury selection rather than at the beginning of jury deliberations, (2) Baker's failure to mention that conversation to the judge during voir dire was found to be an innocent lapse rather than, as in Anstead's case, an intentional act to permit him to continue as a juror, (3) Anstead believed that the bribe emanated from a member of the "Morrison camp," whereas such linkage to the defendant in *Greer* is absent, (4) in *Greer*, the trial judge found that a challenge for cause would not have been granted had Baker answered the questions posed on voir dire accurately, as distinct from here where, had I known of the bribe colloquy between Anstead and the person he believed to be a member of the "Morrison camp," as well as the concomitant effect on his mental state, I would have removed him from the jury for cause, and (5) there is nothing in *Greer* to suggest that Baker, unlike Juror Smith in *Remmer II*, became a "disturbed and troubled man from the date of the [third party] contact until after the trial." [9] *Remmer II*, 350 U.S. at 381, 76 S.Ct. 425.

indicate such an opinion to law enforcement during that October interview session.

**9.** Morrison's counsel reports that "[n]either of the two defendants in *Greer* cited [either]

*Remmer* [decision] in their briefs to the Second Circuit" and *Remmer I* appears solely in the government's brief with respect to the presumption of prejudice arising from a ju-

In sum, *Greer* does not support the government's position.

### d) *Conclusion as to Defendant's Application to Vacate His Convictions Under Counts Two and Eight*

For the reasons indicated, Morrison's motion to vacate his two counts of conviction is granted under the doctrine of implied bias consistent with the holding in *Remmer II*. Embodied within that one-step or consolidated analysis is a consideration of the government's proof bearing on its efforts to rebut the *Remmer* presumption of prejudice. But whether viewed in that unitary fashion or separately, it is clear that the government has not demonstrated that the bribe offer and attendant circumstances did not affect the freedom of action of one or more of the jurors and, thus, the defendant's right to a fair trial. Simply put, the *Remmer* presumption remains unrebutted.

A new trial is required, with the remaining issue before the Court being whether the retrial should be confined to Count Two and Eight, or should it also cover the counts of which defendant was acquitted.

### *Defendant Will be Retried on the Two Counts of Conviction*

The Fifth Amendment of the United States Constitution provides that no person may be placed in jeopardy twice for the same offense. U.S. Const. Amend. 5. That constitutional prohibition appears absent any exceptions in its text. And a long line of Supreme Court decisions have enshrined the "principle that a defendant may not be retried following an acquittal on the same charges." Mehler, Gleeson & James, *Federal Criminal Practice: A Second Circuit Handbook* § 15.5 at p. 258 (Twelfth ed.2012).

The government argues that, "[s]hould the Court find the presumption un-rebutted [thus necessitating] that the convictions be vacated," the retrial should be "on all original counts on the ground[ ] that jeopardy does not attach where the jury tampering rendered the first trial a nullity." (Gov't's July 1, 2013 Letter, n. 1.) That result is required, the government argues, "whether the defendant directly caused the nullity or merely was a passive beneficiary of the criminal acts of others acting in his behalf." *Id.*

■ Defendant, on the other hand, maintains that only the counts of conviction may be retried lest fundamental principles of double jeopardy be violated. Although, surprising, there is a dearth of precedent furnishing concrete guidance thus fostering legitimate dispute, defendant clearly has the better side of the argument.

■ Precisely why the "trial [was] a nullity" because of the bribe offer is not explained. If the thought is that the jury failed to do its job thereby rendering its verdict meaningless, i.e. of no legal effect, that notion lacks support in existing double jeopardy jurisdiction. Consider, for example, the holding in *Evans v. Michigan*, —— U.S. ——, 133 S.Ct. 1069, 185 L.Ed.2d 124 (2013). There, the Court concluded that a midtrial directed verdict and dismissal of a criminal count—based on the trial court adopting a spurious argument made by defense counsel adding an extra element to government's proof—was, nonetheless, an acquittal for double jeopardy purposes. In essence, the trial judge in *Evans* failed to do his job as to this one discrete issue, as the jury in *Morrison* failed to do its job.

---

ror's receipt of extra-record information and in the Second Circuit's decision for the same

purpose. (Def.'s Post–Hr'g Memo. in Supp. at 7.).

But jeopardy in each instance attached,[10] followed by an acquittal (or, in Morrison's case, acquittals), thereby precluding a retrial as to such charge or charges.

Had the defendant been shown to have orchestrated the bribe attempt, an argument could be made that the double jeopardy clause does not bar retrial following an acquittal based on such possible theories as waiver (*cf. United States v. Mastrangelo*, 693 F.2d 269, 272 (2d Cir.1982)[11] or jeopardy having never actually attached in that the result of the proceeding was preordained via a defendant bribing the trier-of-fact (*cf. Aleman v. Honorable Judges of the Circuit Court of Cook County*, 138 F.3d 302 (7th Cir.1998).

While the reference to *Mastrangelo* in the preceding paragraph has been inserted into the discussion by the Court sua *sponte*, the government has cited *Aleman* for the proposition that a retrial, if it is to be held, should cover all counts except Count One,[12] not just the two counts of conviction. (Gov't's Mar. 18, 2013 Letter at 8, 9.)

But a prerequisite to the successful invocation of either of the above, or like theories, is that the defendant was involved in the triggering misconduct. Here, that is not the case and the government does not contend otherwise. Speculation may suggest that Morrison was behind the bribe offer made to Anstead and perhaps he was. But absent from the record, notwithstanding the government's post-verdict investigation and the hearing held before me, is proof—direct and/or circumstantial—linking Morrison to the wronging.

In *Aleman*, the defendant "successfully bribed a Cook County Circuit Judge to acquit him of a murder charge in a 1977 bench trial." *Aleman*, 138 F.3d at 304. As a result, the Seventh Circuit held, in a federal writ of habeas corpus context,[13] that his retrial years thereafter for the same offense was not unconstitutional in that "jeopardy denotes risk," a condition not faced by Aleman because he had " 'fixed' his case." *Id.* at 308–309.

The government recognizes the above distinction, but suggests that it does not render *Aleman* irrelevant for present purposes because the Seventh Circuit "did not explicitly find that the defendant's culpability drove the court's finding that double jeopardy did not bar re-prosecution." (Gov't's Mar. 18, 2013 Letter at 9.)

The government's analysis of *Aleman* is not persuasive. A fair reading of the deci-

---

**10.** In a federal jury case, jeopardy attaches once the jury is empaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 37–38, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978).

**11.** In *United States v. Mastrangelo*, 693 F.2d 269, 272–73 (2d Cir.1982) the Second Circuit explained that a defendant, whose misconduct resulted in the unavailability of a witness, may not then legitimately invoke "his confrontation clause rights in order to prevent prior ... testimony of that witness from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect."

**12.** "Because the Court dismissed Count One pursuant to Fed.R. Crim.P. 29 prior to sub-

mission to the jury, and therefore could not have been affected by the attempted jury-tampering, the government does not contend that Count One should be retried." (Gov't's Apr. 19, 2013 Letter, n. 1.).

**13.** The significance of the procedural context of the holding in *Aleman* is evident from the following excerpt from the decision: "The legal conclusion urged by Aleman [viz. that the Double Jeopardy Clause precludes retrial] might not be an unreasonable application of Supreme Court precedent, but the highly deferential standard of collateral review leads us to hold that the contrary interpretation—the one adopted by the Illinois courts in this case—is also not unreasonable." *Aleman*, 138 F.3d at 308.

sion in its totality demonstrates that the linchpin of its holding is Aleman bribing the trial judge prior to the first trial. Missing from *Aleman*, or any other decision cited by the government, is authority supporting its position that if a third party—without the proven complicity of the defendant—endeavors to bribe a juror with the defendant simply being an incidental, or even intended, beneficiary of those efforts, the resulting verdict is a nullity for double jeopardy purposes.

Similarly unavailing in the government's quest for a retrial across-the-board is *United States v. Martinez*, 210 Fed.Appx. 861 (11th Cir.2006) (per curiam).

By way of background, Martinez, who was tried with eight co-defendants, was convicted by a jury in 1995 of Counts One and Three of an indictment, but acquitted on Count Two. Thereafter, it was discovered that one of Martinez's co-defendants, another person (not Martinez), and a juror had engaged in jury tampering. Martinez, upon learning· of that fact, sought and obtained a new trial. However, for some unexplained reason, the retrial covered not only Counts One and Three, but also Count Two.

Following his conviction and sentence on all three counts, Martinez—in each instance, unsuccessfully—(1) appealed those determinations, on grounds not discernable from the 2006 decision presently under discussion, (2) filed for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, again on nondiscernable grounds and (3) sought a certificate of appealability to challenge the denial of his § 2255 motion.

Against the above backdrop, and after "over three years" had passed since the last of his above listed futile applications, Martinez, proceeding pro se, challenged the district court's "subject-matter jurisdiction over his second trial" under Federal Rule of Civil Procedure 12(h)(3).[14] *Id.* at 862.

The Eleventh Circuit gave this effort short shrift, observing:

> Here, Martinez asked the district court to nullify his criminal conviction pursuant to Rule 12(h)(3). Simply put, because Rule 12(h)(3) is a rule of civil procedure, it did not afford a means of relief for Martinez to invalidate his criminal conviction. Accordingly, we affirm the denial of the Motion to Nullify.

*Id.* at 863 (internal citation deleted).

The procedural basis for the decision in *Martinez* is not lost on the government,[15] but in its view:

> The Eleventh Circuit affirmed the district court's denial of the petition, without addressing the constitutional claim on the merits, and solely on procedural grounds. With good reason: having benefitted from the effort of others to tamper with the jury, neither the Eleventh Circuit nor the district court thought it necessary to address the claim of a defendant who seeks retrial because of jury tampering, and yet pick and choose which counts to retry. The same result should apply here. Morrison cannot have it both ways. To elect a different remedy, such as retrial on

---

**14.** Fed.R.Civ.P. 12(h)(3) provides: "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

**15.** However, the government incorrectly describes the application being reviewed by the Eleventh Circuit in *United States v. Martinez* as Martinez's earlier § 2255 petition. (*See* Gov't's Apr. 19, 2013 Letter at 2–3.) In fact, the implicated application was predicated on Martinez's improper effort to "[n]ullify" the results of the second criminal trial under a provision of the Federal Rules of Civil Procedure.

counts of conviction but not of acquittal arguably rendered by the criminal conduct of those acting in the defendant's favor, would be irrational. If the jury tampering efforts in this case are found by the Court to have tainted the juror, then the jury's entire verdict, acquittals as well as convictions, was invalid.

(Gov't's Apr. 19, 2013 Letter at 3.)

The Court is not prepared to extrapolate from the wholly procedurally-based holding in *Martinez* to the conclusion urged by the government. To do so sans evidence tying Morrison to the bribe offer, would constitute an unwarranted alteration of the double jeopardy protections as presently configured, and as so deeply ingrained in our jurisprudence.

### CONCLUSION

For the reasons indicated, Morrison's application to vacate his 2008 convictions under Counts Two and Eight is granted. Those two counts shall remain open and subject to a retrial. However, the Fifth Amendment's double jeopardy clause precludes his reprosecution on the other counts.

SO ORDERED.